# Brooks v. Patterson.

(Decided June 10, 1930.)

EUGENE R. ATTKISSON for appellant.

BLAKEY, DAVIS & LEWIS for appellee.

OPINION OF THE COURT BY COMMISSIONER STANLEY—
Reversing.

The appellee, Mrs. Carrie Pell Patterson, filed this suit against the appellant, Horace G. Brooks, to recover damages by reason of his malicious and wrongful act in inserting an advertisement in a newspaper that her drug store was for sale for "about $6,000.00," which induced the withdrawal of an offer of $8,500, and prevented her from obtaining more than $6,500 for the business.

It was being conducted in property leased from the appellant. Debts had accumulated to the amount of about $5,000, including $750 owing the landlord. He, with other creditors, was pressing the plaintiff for payment. Her husband was in poor health, and for these reasons it became necessary for her to dispose of the

business and liquidate her indebtedness. The appellant recognized that it was to his own advantage to have it sold as a going concern and thereby keep his building occupied. The parties conferred several times with respect to the situation, and Mr. Brooks assisted Mrs. Patterson in trying to effect such a sale, sending several prospective purchasers to see her. She had been, as he knew, asking $8,500 for the business, although there is conflict in the evidence as to whether or not during their confidential conversations Mrs. Patterson had said that she would take $6,000 and also whether she had expressed a purpose to turn the business over to a representative of the creditors for liquidation.

Negotiations were entered into between Mrs. Patterson and L. E. Coogle without Brooks being concerned. These negotiations on March 29, 1927, culminated in a written offer to buy the business. A copy of the writing is not in the record before us, but it appears that it was an offer to purchase a one-half interest for $4,000, and, if it was as good as represented, he would pay $4,500 for the other half interest after the expiration of six months. But the offer was by its terms conditioned on Brooks reducing the rent. Mrs. Patterson testified that it was further understood that she was to confer with her husband before accepting the offer. It is established by the evidence of Brooks and Coogle that when the former was approached with reference to reducing the rent he declined to do so, and that Coogle stated he would not buy the business. Mrs. Patterson, however, says that Coogle did not definitely withdraw the offer, but stated that they would see Brooks again and try to induce him to come down.

With the negotiations in this status, Brooks, without any authority from Mrs. Patterson, on March 30th and 31st, had this advertisement inserted in the "For Sale" columns of Louisville newspapers:

"Drugstore on one of the busiest corners in city; proprietor sick and has to sell at once; good long lease on building; will take about $6,000.00; act now. Address M— 125 C. J. & Times."

Coogle promptly saw this advertisement, and, learning that it had reference to the Patterson store, definitely withdrew his offer, which was still pending according to the evidence of Mrs. Patterson. Two days later, after

Mrs. Patterson had sent for him to come and see her, he offered $6,500 for the business which she accepted.

This suit was then instituted seeking to recover $2,000, the difference between the first and second offers. A judgment for $500 was rendered in favor of Mrs. Patterson, and the defendant appeals.

The petition alleged that the business was worth $9,000; that at no time prior to the events mentioned had the plaintiff offered to sell it for less than $8,500; that the defendant knew because of the ill health of her husband and other reasons beyond her control it was necessary that she sell the business promptly, and without authority had maliciously and without probable cause inserted the advertisement in disparagement of plaintiff's title in the property; and that the statement that it was for sale for "about $6,000.00" was false. Special damage in the sum stated was alleged because she was unable to sell her business for more than $6,500 on account of the defendant's act, and that the prospective purchaser with whom plaintiff was negotiating would have paid her at least $8,500 for the business but for the advertisement, which he read, and which caused him to refuse to pay more than $6,500 therefor.

Issue was joined, and, after the presentation of evidence, the court overruled defendant's motion for a directed verdict. The jury was instructed, in substance and effect, that, if they should believe from the evidence the facts alleged were true and that as a result of the advertisement the value of plaintiff's business was so depreciated that she was unable to sell it at the reasonable value thereof, then they should award the plaintiff such sum in damages as they believed represented the difference between the reasonable value of the business and the sum of $6,500, not exceeding the sum of $2,000; and, unless they should so believe, their verdict should be for the defendant.

The appellee insists that she has a good cause of action for slander of title of property, which is thus defined in 17 R. C. L. 216:

> "An action for slander of title is an action for special damage sustained by reason of the speaking of slander of the plaintiff's title to property. The action in its nature is not properly for words spoken or for a libel written or published, but is in the nature of an action of trespass on the case for special damages sustained by reason of the act of the defendant.

The cause of action is denominated 'slander of title' by a sort of figure of speech in which the title is presonified and made subject to many of the rules applicable to personal slander when the words themselves are not actionable."

And in part in 37 C. J. 129:

"Slander of title may be defined as a false and malicious statement, oral or written, made in disparagement of a person's title to real or personal property, or of some right of his, causing him special damage."

The two cases principally relied upon are Hopkins v. Drowne, 21 R. I. 20, 41 A. 567, and Long v. Rucker, 166 Mo. App. 572, 149 S. W. 1051, in each of which a landlord had falsely stated or published that a tenant had no lease on his premises or that his lease was for a less term or of a less valuable character than it actually was, and by reason of such false publication the tenant was prevented from making a sale of his business which would carry with it the unexpired term of a valuable lease. But there was no sort of representation here in disparagement of plaintiff's lease or title. It may be said that there was evidence to sustain the plea that the publication that plaintiff would sell her business for about $6,000 was false. Further, there may have been deduced from the eagerness of the defendant to realize quickly and certainly on his claim, and from the benefit inuring to him through the continued occupancy of his building, the prerequisite actuating element of malice—not in its worst sense, but such malice as consists of bad faith or an intention to deceive or do a wrongful act without legal justification or excuse in order to benefit the defendant in disregard of the injurious consequences to the plaintiff. Of interest is Schonwald v. Ragains, 32 Okl. 22, 122 P. 203, 39 L. R. A. (N. S.) 854, containing a compilation of judicial definitions of malice as used in this connection. There was slight evidence tending to prove that the withdrawal of Coogle's offer was induced by this advertisement, although it was more persuasively made to appear that the offer was automatically canceled because of Brooks' refusal to reduce the rent, a condition upon which it was made. Nevertheless, the evidence, giving to it the aspect most favorable to the plaintiff, did not disclose any representation of a defect or infirmity in, nor libel

or disparagement of, her title or ownership of the property.

There is, however, presented another classification of the case which must be given consideration. In comparatively recent years there has grown up in the evolution of the law the recognition of a new and distinct tort, which is termed "interference." It is divided by the authors of Ruling Case Law into "interference with relation of master and servant," "interference with contract relations," and "interference with trade or calling." In 3 Elliott on Contracts, sec. 2685, it is pointed out that there has been great disagreement among the authorities on this subect, but that the tendency of the courts has been to increase the duty of third persons to respect the rights of contracting parties to carry out their contracts and to grant a remedy to the party injured by the interference of a third person when formerly the law would have held such interference to be damnum absque injuria. We are not here concerned with the subject where the personal element or the relation of employer and employee is involved, but must confine the scope of the opinion to the subject as it relates to interference with other contract relations, in which classification the facts of the case place it.

The authorities suggest that the recognition of this tort seems to have had its origin in the celebrated English case of Lumley v. Gye. 2nd El. & Bl. 216, 75 E. C. L. 216, in which it was held that the manager of a theater could recover damages from one who had maliciously procured another under contract to sing in his theater to breach her contract. As is further stated in 15 R. C. L. 54, the doctrine of actionable liability of a person for inducing a breach of contract for personal services, intending thereby to injure another or to benefit himself, has been extended in a majority of the jurisdictions of the United States to all classes of contracts. Continuing, it is said: "The theory of this doctrine is that a party to a contract has a property right therein which a third person has no more right maliciously to deprive him of, or injure him in, than he would to injure his property real or personal, and that therefore such an injury amounts to a tort for which the injured party may seek compensation by an action in tort for damages. Under such circumstances to say that the injured party has his remedy against the other contracting party is in many

cases offering a mere shadow for substance, for often times the other party to the contract may be financially irresponsible.''

But this court has not altogether followed that rule, and confines recovery of damages to cases involving interference in contractual relations between master and servant and where a person by coercion or deception has been procured against his will or contrary to his purpose to breach a contract. It is held otherwise that only those who are parties to or in some manner bound by the contract are liable for breach thereof, although the third party may have been actuated by malicious motives. In Chambers and Marshall v. Baldwin, 91 Ky. 121, 15 S. W. 57, 12 Ky. Law Rep. 699, 11 L. R. A. 545, 34 Am. St. Rep. 165, this subject is carefully considered and elaborately treated; the conclusion being announced that plaintiff could not maintain an action against a person who had procured another to breach a contract to sell and deliver his tobacco to him although such procurement was malicious. It is to be observed, however, that the ground upon which the right so to maintain the action was denied was that the act of defendant was not the direct or proximate cause of the plaintiff's damage, but rather the voluntary act of the seller of the tobacco, who had not been induced to. break his contract by either force or fraud. The reasoning of this case has been highly regarded and followed in several other jurisdictions. See Swain v. Johnson, 151 N. C. 93, 65 S. E. 619, 28 L. R. A. (N. S.) 615.

Three days after the Chambers opinion was delivered, the court decided Bourlier Brothers v. Macauley, 91 Ky. 135, 15 S. W. 60, 61, 12 Ky. Law Rep. 737, 11 L. R. A. 550, 34 Am. St. Rep. 171, which was much like the old English case above referred to. It involved the breach of a contract between the manager of the famous actress, Mary Anderson, with the proprietor of a theater in Louisville, and the engagement to perform at a rival theater. The act in this case, however, was not charged to have been committed maliciously or with the purpose to injure the plaintiff. The difference, however, was held to be immaterial, for (quoting Jenkins v. Fowler, 24 Pa. 308), ''Malicious motives make a bad case worse, but they cannot make that wrong which, in its own essence, is lawful.'' It was declared that the vital question in such cases always is whether the act was in itself a legal

wrong, and, following the reasoning of the other opinion, it was held that there was no cause of action.

In distinguishing and analyzing these two opinions, in Chambers v. Probst, 145 Ky. 381, 140 S. W. 572, 36 L. R. A. (N. S.) 1207, where it was held that false and malicious statements concerning the manner in which an employee performed his duty which resulted in his discharge was actionable, it is pointed out that the basic principle upon which they rested was that the acts complained of were the outgrowth of competition in business, and that it was inferentially held, if not expressly decided, that, if the injury had been brought about by the exercise of either fraud or force, a different case would have been presented. Swain v. Johnson, supra, citing Chambers and Marshall v. Baldwin and other cases, held that no action lies to recover for the loss of a bargain by one who had contracted to purchase property where the vendor had been induced to break his contract and transfer title to the defendant unless the vendor acted against his will or contrary to his purpose through coercion or deception. Reference is to be made also to what is regarded as the leading case of Knickerbocker Ice Company v. Gardiner Dairy Company, 107 Md. 556, 69 A. 405, 16 L. R. A. (N. S.) 746. The annotations to these two cases show the various applications as well as the rejections of this doctrine under consideration.

Compare Brewster v. Miller Sons Company, etc., 101 Ky. 368, 41 S. W. 301, 19 Ky. Law Rep. 593, 38 L. R. A. 505, where it was held no cause of action existed against members of a funeral directors' association because of the refusal of one of them to render burial service on account of the plaintiff's indebtedness to another member; it being declared that it is a part of every man's civil right to exercise the liberty of refusing to enter into business relations with another, regardless of his reasons therefor.

The claimed wrong in the instant case is not that a contract was breached but that the defendant by his wrongful intermeddling induced Coogle to withdraw his offer of $8,500 and prevented plaintiff from obtaining a better price for her property than she did receive. So there was not in fact a breach of an existing contract to which the foregoing authorities applied. But, as stated in section 2691 of Elliott on Contracts, the same general governing principle has been applied in cases where a

764

third person has prevented the making of future contracts on the ground of unjustifiable interference.

It is to be concluded from our own opinions, and those of other jurisdictions adopting similar views, that no action ex delicto lies against an intermeddler who, though maliciously or without a legitimate interest to serve or justifiable cause, induces a person to breach his contract with another, unless the stranger to the contract has employed unlawful means, such as fraud, deceit or coercion, and special damage is sustained as a direct and proximate result.

If the act of the defendant be considered as maliciously chilling the sale of plaintiff's property and it be regarded that the element of fraud or deceit exists by reason of a false representation as to sale price of the property, and that Coogle was thereby induced to withdraw his conditional offer of $8,500, still it was not shown that the loss sustained was directly and proximately caused thereby. The plaintiff might well have denied the statement that the property could be bought for "about $6,500.00" and have refused to accept the offer of $6,500 that was subsequently made for it was a matter solely within her power. It was her distressed situation that forced the sale rather than the defendant's act.

Assuming the petition stated a cause of action, which is very doubtful, the plaintiff having failed to establish a case, the court should have directed a verdict for the defendant.

The judgment is reversed.