**COCA–COLA BOTTLING WORKS (THOMAS) INC., Appellant,**

v.

**HAZARD COCA–COLA BOTTLING WORKS, INC., Appellee.**

**HAZARD COCA–COLA BOTTLING WORKS, INC., Cross-Appellant,**

v.

**G. D. POLLY and Coca-Cola Bottling Works (Thomas) Inc., Cross-Appellees.**

Court of Appeals of Kentucky.

Jan. 23, 1970.

Richard F. Newell, Squire R. Ogden, Ogden, Robertson & Marshall, Louisville, Wells & Wells, Hazard, for appellant and cross-appellee Coca-Cola Bottling Works (Thomas) Inc.

Bruce Stephens, Jr., Duff Arnett, Hazard, for appellee and cross-appellant Hazard Coca-Cola Bottling Works, Inc.

Ronald G. Polly, Whitesburg, Willis W. Reeves, Richard Ward, Reeves, Barret, Cooper & Ward, Hazard, Stephen Combs, Jr., Whitesburg, for cross-appellee G. D. Polly.

STEINFELD, Judge.

Hazard Coca-Cola Bottling Works, Inc. (hereafter Hazard) sued G. D. Polly and later Coca-Cola Bottling Works (Thomas) Inc. (hereafter Chattanooga), Raymond S. Matthews, Coca-Cola Bottling Company of Norton, Inc. (hereafter Norton), Coca-Cola Company of Whitesburg, Kentucky (hereafter Whitesburg) and The Coca-Cola Company (hereafter Atlanta). It sought recovery from Polly for breach of contract and from the others for conspiracy to unlawfully induce Polly to breach the contract and interference with the performance of the contract. The conspiracy claims were dismissed before trial by a final order entered on May 20, 1967. Before or during the trial all defendants were dismissed except Polly and Chattanooga. When the case was submitted to the jury the only claims remaining were for breach of contract by Polly and against Chattanooga for inducing the breach.

The jury returned a verdict against Polly for $5,000 and against Chattanooga for $18,000. Polly did not appeal but Chattanooga did from the judgment entered pursuant to that verdict. Hazard cross-appealed against Polly and Chattanooga and attempted to appeal against Matthews, Norton, Whitesburg and Atlanta. Preliminary orders of this court have disposed of all matters except the appeal of Chattanooga as to Hazard and the cross-appeal of Hazard as to Chattanooga and Polly.

We first approach the appeal of Chattanooga and relate the facts we consider germane to the issues presented. Norton was a "first-line" bottler for Atlanta. Chattanooga had the right by contract with Atlanta to bottle and sell coke and to license others to do so in Kentucky. Hazard was a "sub-bottler" in Perry and Knott counties, strictly controlled by a contract with Norton dated April 30, 1942, which had the approval of Atlanta and Chattanooga. (There had been previous contracts). It provided for the purchase of syrup and supplies, and imposed certain obligations in the bottling, advertising and selling of Coca-Cola products. The original term expired November 1, 1943, but was subject to automatic renewal for successive two-year terms unless Norton, with the approval of Atlanta and Chattanooga, gave notice of non-renewal at the end of the term. It also provided that if terminated Norton would purchase the supplies, equipment and machinery used in bottling cokes.

Late in the 1950's the renewal terms were reduced to one year each. Because of dissatisfaction in the conduct of Hazard's business, Norton in 1964 notified Hazard that the contract would be terminated November 1, 1965, and the contract was amended to state that if Hazard had not sold its business to a satisfactory buyer Norton would purchase additional assets of Hazard.

During the long period while Hazard had the Coca-Cola franchise, in order to service customers, it had acquired land, buildings, trucks and machinery. About the same time termination of the contract was contemplated, Hazard in order to comply with the contract, was required to purchase certain equipment at an expenditure of approximately $50,000.

On April 16, 1965, Polly entered into a purchase agreement with Hazard whereby he agreed to pay $162,000 for substantially all its assets. He delivered his check for

$5,000 in escrow "as a guarantee of the performance of this agreement which shall constitute liquidated damages for any failure to so perform." The transfer of bottling rights to Polly was subject to approval of Norton, Chattanooga and Atlanta.

For two days before the agreement was executed the employees of Hazard had been on strike, but had returned to work before the contract was signed. April 19, 1965, Polly arrived at the plant and found that they were again striking. He left, went to Whitesburg and refused to go through with the contract.

Hazard's operations were continued, but were disrupted by labor difficulties and its status was clouded by the dispute with Polly, nevertheless, it continued to seek a purchaser. In August 1965 all of its assets, except the real estate, were sold to one Raymond Collins for $94,737.43. Less than a year later Polly bought the business from Collins for $154,000.

Hazard claimed a net loss of $27,000, the adjusted difference between the Polly contract ($162,000) and the Collins' sale. It conceded that adjustments had to be made in inventory and accounts and it excluded the real estate valued between $45,000 and $62,000. It also sought recovery of $8,700 in earnings lost during the seven-week strike.

Appellee says that Ray Matthews, executive vice-president of Chattanooga, encouraged Polly not to comply with the terms of his contract and that Matthews represented to Polly that the franchise of Hazard had been cancelled. Among other arguments for reversal Chattanooga contends that there was an absence of proof showing that it induced Polly to break the contract. Testimony of Polly on this subject is somewhat equivocal but it is undisputed and crystal clear that when he found the Hazard plant struck and the business not operating he drove back to Whitesburg. He notified his manager that he was not going through with the deal and he told his own lawyer and a lawyer repre-

senting some of the Hazard stockholders of his decision. He then called Matthews at Chattanooga solely and only for the purpose of notifying that company that he was not going to be involved in the Hazard operation. Additionally, he directed his office in Naples, Florida to stop payment on the $5,000 escrow deposit check but the proof is not entirely clear as to whether these instructions were given before or after he talked with Matthews.

In the testimony of Polly we find:

"Q. In other words you had made up your mind definitely not to go through with the contract before you called to Mr. Matthews?

"A. I must have or I wouldn't have got in my car and gone back and started making these arrangements, starting talk to my attorneys and, talk to my attorneys, talk to my manager and gave them their instructions and, evidently, I had made up my mind that I wouldn't go through with it. It wasn't a going business as stated in the contract. They could not turn me over a going business and had never turned me over a going business and I don't know when they could have turned me over a going business and I would not be able to enter a contract to purchase what the contract said I was to purchase.

"Q. You had made up your mind before you called Mr. Matthews that you were not going through with it?

"A. As I have stated we have worked very closely under these people in Chattanooga, we keep them informed and we operate under their directions."

We hold that even including the contents of a deposition of Polly which Chattanooga claims should not have been used on trial there was an absence of substantive evidence showing that Matthews induced Polly to cancel. The proof having been insufficient, Chattanooga's motion for a directed verdict should have been sustained.

On cross-appeal Hazard contends that the trial court erred in limiting the recovery against Polly to $5,000. It says that the contract disclosed the actual intention of the parties to have been that the escrow fund of $5,000 was a guarantee of performance by the buyer rather than a measure of damages in case of his failure to perform. On the contrary Polly contends that the agreement limited his liability for breach to that amount. The contract said that: "The Buyer agrees upon the execution hereof to deposit in escrow * * * the sum of Five Thousand ($5,-000.00) Dollars as a guarantee of the performance of this agreement which shall constitute liquidated damages for any failure to so perform." We concede that this language indicated that the deposit was a guarantee of performance but we find no merit in the contention that it did not "constitute liquidated damages for any failure to so perform."

Hazard cites Fidelity and Deposit Company of Maryland v. Jones, 256 Ky. 181, 75 S.W.2d 1057 (1934), and 22 Am.Jur.2d Damages, section 221, page 307 and argues that " * * * $5,000 has no reasonable relation to the potential damage which may be suffered in the sale of this business for $162,000. It is patently disproportionate on the low side." Hazard refers us to Pembroke v. Caudill, 160 Fla. 948, 37 So.2d 538, 6 A.L.R.2d 1395 (1948). There have been many cases before this court on questions of whether a contractual provision resulted in a penalty or amounted to liquidated damages.

We held in Real Estate & Mortgage Co. of Louisville v. Duke, 251 Ky. 385, 65 S.W.2d 81 (1933), that a liquidated damage provision was unenforceable because the stipulated sum was unreasonably large, but in Fidelity & Deposit Company of Maryland v. Jones, 256 Ky. 181, 75 S.W.2d 1057 (1934), cited by Hazard we ruled that the liquidated damage provision was enforceable. In Woodbury v. Turner, Day & Woolworth Manufacturing Co., 96 Ky. 459, 29 S.W. 295 (1895), we approved a $25,000 liquidated damage provision with respect to sale of property valued from $351,000 to $376,000 and noted that the seller's damage was not subject to certain estimates. Also see Gropp v. Perkins 148 Ky. 183, 146 S.W. 389 (1912) and Smith v. Ward, Ky., 256 S.W.2d 385 (1953). We approved a liquidated damage clause in a contract in Miles v. Proffitt, Ky., 266 S.W.2d 333 (1954), in which we wrote:

"There is perhaps no question more difficult to determine than the amount of damages which may arise from the loss of profits of a 'going concern,' such as a motor court in operation during the period of time a buyer may have held it under a contract such as that in controversy here. We are dealing with very valuable, highly-developed property, tied up with complex and variable economic forces. So many factors enter into the conduct of such a business that any loss occasioned to the seller in event of a breach of this type of contract would be undoubtedly uncertain and conjectural * * *".

Legislative enactments approve (KRS 355.2–718) and courts favor "liquidated damage" provisions in contracts. Maryland Casualty Co. v. Ballard County, 217 Ky. 343, 289 S.W. 316 (1926); Wise, Trustee v. United States, 249 U.S. 361, 39 S.Ct. 303, 63 L.Ed. 647 (1919); Gustav Hirsch Organization, Inc. v. East Ky. Rural Elec. Co-op Corp., 201 F.Supp. 809 (D.C.Ky.1962). In that latter case it was said:

"While the authorities recognize that at one time courts looked with disfavor upon contracts providing for liquidated damages, that time has long passed, and the courts now are 'strongly inclined to allow parties to make their own contracts, and to carry out their intentions, even when it would result in the recovery of an amount stated as liquidated damages, upon proof of the violation of the contract, and without proof of the damages actually sustained.' United

States v. Bethlehem Steel Co., 205 U.S. 105, 27 S.Ct. 450, 51 L.Ed. 731."

We made this clear in Maryland Casualty Co. v. Ballard County, 217 Ky. 343, 289 S.W. 316 (1926), in which we said:

"Courts are favorably inclined toward the adjustment of damages by the parties, and, when they enter into a solemn written obligation, by which they agree that the failure of a party to the contract to perform his undertaking shall be adjusted by the payment of certain stipulated damages which are not unreasonable, the courts will enforce the same."

█ Courts should, and do, enforce the agreement unless the proof clearly shows that according to the circumstances existing at the time of the execution the amount was grossly disproportionate to the damage which might flow from a breach. Gustav Hirsch Organization, Inc. v. East Ky. Rural Elec. Co-op Corp., 201 F.Supp. 809 (D.C.Ky.1962); Lu-Mi-Nus Signs, Inc. v. Jefferson Shoe Stores, 257 Ill.App. 150; 25 C.J.S. Damages § 101, p. 1024.

It is stated in 22 Am.Jur.2d 321, Damages, section 235 that:

"The effect of a clause for stipulated damages in a contract is to substitute the amount agreed upon as liquidated damages for the actual damages resulting from breach of the contract, and thereby prevents a controversy between the parties as to the amount of damages. If a provision is construed to be one for liquidated damages, the sum stipulated forms, in general, the measure of damages in case of a breach, and the recovery must be for that amount. No larger or smaller sum can be awarded even though the actual loss may be greater or less. The rule that the liquidated amount establishes the upper limit of recovery is not applicable, however, where the provision for the liquidated amount is, by its very language, applicable at the election of the nonbreaching

party and the nonbreaching party refuses to so elect."

We construe the provision as one for liquidated damages—not a penalty—it established "the upper limit of recovery."

Lastly, Hazard argues that the trial court erred in not awarding interest on the $5,000 recovery from the date of the breach of the contract and refers us to Helton v. Hoskins, 278 Ky. 352, 128 S.W. 2d 732 (1939) and McLaughlin v. Union-Leader Corporation, 100 N.H. 367, 127 A.2d 269, 63 A.L.R.2d 1425 (1956). Polly responds that Hazard did not allege or prove demand for payment of the $5,000 and never did plead, prior to judgment, any allegation or demand for interest on the $5,000 from the date of the breach. He also notes that Hazard did not timely move to amend the judgment.

█ Judgment was entered on June 7, 1968, and on June 20, 1968, Hazard mailed to Polly's attorney (CR 5.02) a copy of a motion to amend the judgment to award interest on $5,000 " * * * from the date of the escrow agreement." CR 59.05 states that "A motion to alter or amend a judgment, or to vacate a judgment and enter a new one, shall be served not later than 10 days after entry of the final judgment." In 7 Kentucky Practice, Clay, 212 it is said: "The motion to alter, amend or vacate must be *served* within the 10 day time limit * * *. (T)he court does not have general control of a judgment for longer than 10 days after its entry unless an authorized motion or action is taken within that time." The motion came too late. Roberts v. Osborne, Ky., 339 S.W.2d 442 (1960); Whittenberg Engineering & Construction Co. v. Liberty Mutual Ins. Co., Ky., 390 S.W.2d 877 (1965).

The judgment is reversed on the appeal of Coca-Cola Bottling Works (Thomas) Inc. and is affirmed on the cross-appeal of Hazard Coca-Cola Bottling Works, Inc.

All concur.