**ENGINE SPECIALTIES, INC., Plaintiff,**

v.

**BOMBARDIER LIMITED, Defendant.**

**Civ. A. No. 71–16.**

United States District Court,
D. Massachusetts.

Sept. 1, 1971.

Robert S. Frank Jr., Thayer, Fremont-Smith, Choate, Hall & Stewart, Boston, Mass., for plaintiff.

George H. Lewald, William L. Patton, Ropes & Gray, Boston, Mass., for defendant.

## MEMORANDUM OF DECISION THAT PRELIMINARY INJUNCTION ISSUE

GARRITY, District Judge.

This matter comes before the court on plaintiff's motion for preliminary injunction. Plaintiff's complaint presents two tort claims and alleges violations by defendant of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Jurisdiction is founded upon diversity of citizenship under 28 U.S.C. § 1332 and upon 15 U.S.C. §§ 15 and 26. Affidavits, exhibits and an agreed stipulation of facts were filed, and the court heard oral argument. Memoranda of law have been filed by both parties.

### Findings of Fact

1. Plaintiff, Engine Specialties, Inc. (ESI), is a Pennsylvania corporation with its principal place of business in Pennsylvania. At all times relevant to this lawsuit, plaintiff has engaged in the business of distributing recreational vehicles, including light weight motorcycles, mini-bikes, go-carts, scooters and snowmobiles.

2. Defendant, Bombardier Limited, is a Canadian corporation with its principal place of business at Valcourt, Quebec, Canada. Bombardier is the largest manufacturer of snowmobiles in the world, marketing its "Ski-Doo" snowmobile through an extensive dis-

tributor and dealer network in the United States and around the world.

3. During the spring of 1967, ESI entered into a written agreement with Agrati-Garelli (Agrati), an Italian corporation, whereby Agrati would manufacture mini-cycles and sell them to ESI for distribution in the United States, Canada and Mexico. ESI distributed these mini-cycles under the trade name "Broncco."

4. On May 20, 1968, ESI and Agrati entered into a further written agreement which provided for the manufacture and sale of "mini-bikes." Paragraph 10 of this agreement stated:

> This Agreement shall remain in full force and effect for a minimum period of one year from the date hereof. Thereafter either party hereto shall have the right to terminate this agreement by giving * * * notice at least six (6) months prior to the date of expiration * * *. However, should AGRATI be the party terminating this Agreement * * * then insofar as the 917 "BRONCCO" and the "Mini-Bike" and any and all modifications thereof is concerned, AGRATI agrees that it shall not market, sell or supply, directly or indirectly, for and into the territories of the United States of America, Mexico and Canada the "BRONCCO" for a period of two (2) years and the "MINI-BIKE" for a period of one (1) year, after the date of termination of this contract.

5. On March 26, 1970, ESI and Agrati entered into a new agreement pertaining especially to ESI's obligation under a separate oral agreement to purchase other types of motorcycles not of the sizes and makes involved in this action. The 1970 agreement provided that if a default of the May 20, 1968 contract or of the March 26, 1970 contract should "continue for a period of 20 days, then, without further notice or action on the part of Agrati * * * the 1968 agreement shall terminate and Agrati shall be free to sell, market and supply all its vehicles, parts and equipment to any other parties for and into the * * * United States of America, Mexico and Canada * * * as if the 1968 agreement had never existed."

6. At various times during the course of business dealings between ESI and Agrati, issues arose as to shipping schedules and letters of credit, which might have indicated a default by one party or the other. These issues were amicably settled. In the spring of 1970, Agrati was delayed in its spring shipment due to strikes, difficulties in getting supplies, and a dispute with ESI over payment for certain full-size motorcycles which ESI had purchased. Officers of ESI and Agrati met in Pennsylvania in August 1970 and agreed that ESI's president, Carmen DeLeone, would meet with Agrati in Italy in September for the purpose of renegotiating shipping schedules.

7. Since early 1969, defendant Bombardier has actively investigated the prospect of developing its own mini-bike. On August 12, 1970, a meeting arranged by a neutral attorney named Owen Carter took place between officers of Bombardier and Agrati at defendant's offices in Canada. Possible business arrangements between Bombardier and Agrati were discussed, but no agreement was reached.

8. After an exchange of letters, officers of Bombardier and Agrati met again on September 16, 1970 at Agrati's factory in Italy. Bombardier's representatives offered to buy "Bronco type" mini-bikes for delivery between December 1970 and March 1971. Agrati's president, Antonio Agrati, expressed "much interest," but explained the limitations created by the ESI-Agrati contract. It was then mentioned that ESI's president, DeLeone, was also visiting the Agrati factory. DeLeone was summoned, and Beaudoin, Bombardier's president, expressed an interest "in obtaining his distribution"; Beaudoin also proposed that, in return for the cancelling of its distributorship, ESI would receive, among other things, investment

capital from Bombardier. DeLeone heatedly refused. Beaudoin noted in a memorandum of the meeting that after DeLeone left Agrati agreed to send ESI the six-month termination notice and it was agreed that Owen Carter would meet with Agrati's lawyer "to study the means possible to get around the contract and the means available to [Bombardier] so as to obtain this season delivery of the mini-bikes (or from today to the date of the termination of the contract)."

9. The lawyers and officiers of Bombardier and Agrati met again on September 17. They concluded that after the termination date of Agrati's contract with plaintiff (May 19, 1971), Agrati would be able to sell parts to Bombardier for manufacturing "of mini-bikes or of BRONCO * * *" and that by June 1971 Bombardier and Agrati would form a partnership for this purpose. In the interim, it was decided that Bombardier would put out its own mini-bike, trade-named the FUNDOO.

10. Agrati mailed its termination letter to ESI on September 18.

11. On October 16, 1971 Agrati wrote ESI complaining that ESI had not sent letters of credit with respect to shipments which Agrati proposed to make in September and October and stating that Agrati considered ESI to be in default under the May 1968 agreement.

12. On October 19 an Agrati representative, one Della Croce, telephoned ESI and agreed to change the shipping schedule so that shipments would begin in mid-November.

13. By letter dated October 26, 1970, ESI's president DeLeone wrote Agrati contesting the October 16 default allegation and reciting in support of his position (a) the difficulties created by Agrati's spring shipping problems, (b) the superseding October 19 telephone conversation with Della Croce, and (c) DeLeone's own reading of ESI's purchase obligations under the contract.

14. By telegram sent November 6, Agrati demanded that ESI establish immediately letters of credit to cover shipments scheduled to be made between November 10 and 16.

15. On or about November 7, Bombardier's executive vice-president and counsel, Charles Leblanc, met with Attorney Carter and representatives and lawyers of Agrati, including Della Croce. At this meeting, the default provision in the ESI-Agrati contract was discussed, and the participants also discussed whether ESI had defaulted and whether the October 16 letter from Agrati operated to declare a default.

16. Bombardier and Agrati entered into an agreement on November 14. That agreement was drawn in the following manner: (a) the basic agreement was between Bombardier and a holding company called "Holdings"; (b) Bombardier and "Holdings" agreed to set up a third company as a joint venture for the manufacture and distribution of motorcycles; (c) an unnamed "European Corporation" was to provide both parts and completed vehicles to the newly created company and to Bombardier. Appended to the basic agreement was a statement by Agrati identifying itself as the "European Corporation," accepting the terms of the agreement, and agreeing "to deliver to the 'Company' and/or 'Bombardier' according to the said agreement, after this date, if and when ordered," mini-cycles and parts. Finally, by letter dated the same day, Bombardier agreed to indemnify Agrati to the extent of one-half of any damages "arising out of a contract dated May 20, 1968 between you and the said ESI."

17. An earlier draft of the Agrati statement appended to and incorporated into the November 14 contract would have provided for delivery of motorcycles to the new company "after May 20, 1971 if and when ordered * * * (save mini-bikes for a period of one year and a mini-bike designated 'Broncco' for a period of 2 years from May 20, 1971) * * *." At the specific re-

quest of Beaudoin, based on his alleged understanding of Agrati's rights under the default clause, Agrati changed this language in the final agreement to provide for immediate delivery. It would appear that in making this change, Agrati relied on Beaudoin's representations.

18. On November 15, ESI cabled Agrati concerning the letter of credit request of November 6 and seeking to delay shipment for 10–15 days.

19. By letter dated November 25, Agrati declared the 1968 and 1970 agreements immediately terminated, citing ESI's failure to open letters of credit and meet schedules of delivery. Since November 25, 1970 Agrati has refused to make any shipments to ESI, including the shipment of parts.

20. On December 8, 1970 ESI opened a letter of credit respecting the November shipment and so informed Agrati by cable. Agrati cabled in reply that it confirmed its letter of November 25 and that any inquiries should be made through its Philadelphia lawyers. Agrati's lawyers informed ESI that no shipments would be forthcoming.

21. Since December 1970, Agrati has supplied Broncco-type mini-bikes to Bombardier for distribution in the United States and Canada. During the period following Agrati's decisions to stop supplying ESI and to start supplying Bombardier, ESI's gross revenues have been reduced substantially, perhaps by as much as fifty percent. ESI's losses are due in substantial part to its loss of the Agrati line and the appearance of the Agrati-Bombardier product on the market.

22. ESI claims, and it appears probable, that unless an injunction issues its very continuation in business is jeopardized since the sale of mini-bikes is the major part of its business. In contrast, potential harm to the defendant stemming from an injunction is considerably less. Defendant and its dealers are prospering from sales of snowmobiles; in addition, sales of the Agrati product have been substantially below defendant's expectations.

## Conclusions of Law

For a plaintiff to prevail in a motion for a preliminary injunction, he must demonstrate a probability of prevailing on the merits and a danger of immediate irreparable harm absent such relief. Automatic Radio Mfg. Co. v. Ford Motor Co., 1 Cir., 1968, 390 F.2d 113, 115. In the court's opinion, plaintiff has demonstrated the necessary likelihood that it will prevail on the merits of its claim of tortious inducement of Agrati by defendant to breach its distributorship contract, specifically its agreement not to compete.[1] There is no material dispute between the parties as to the test applicable here; for liability to adhere "[a] defendant must act: * * * (1) for the purpose of causing this specific type of harm to the plaintiff, (2) such act must be unprivileged, and (3) the harm must actually result." Bruce Lincoln-Mercury, Inc. v. Universal C. I. T. Credit Corp., 3 Cir., 1963, 325 F.2d 2, 13, quoting Birl v. Philadelphia Electric Company, 1960, 402 Pa. 297, 300, 167 A.2d 472. In addition, defendant's conduct must result in a breach by the induced party; there would appear to be no prohibition against advising a party to a contract to exercise his legal rights under it, so long as the advisor's competitive privilege is not negated by a malicious intent or the use of improper means. See Northeast Airlines, Inc. v. World Airways, Inc., D.Mass., 1966, 262 F.Supp. 316, 320.[2]

---

1. The court's omission in this memorandum to discuss the plaintiff's antitrust contentions is not meant to imply that plaintiff is unlikely to prevail on the merits of its antitrust claims. There has simply been no need at this preliminary stage of the proceedings to reach them.

2. Thus, where a party to a contract may terminate after notice or may refuse to renew at the expiration of the time of the contract, inducement of such party to redirect his business, absent malice or wantonness, is not proscribed.

Initially, it appears that plaintiff will establish a breach by Agrati upon one of two acts: (1) Agrati's refusal after November 25, 1970 to provide. mini-cycles to plaintiff, a refusal which plaintiff contends was not pursuant to a valid invocation of the default clause;[3] (2) Agrati's November 14, 1971 agreement with defendant which, in specifically obliging Agrati to provide mini-cycles to defendant "after this date, if and when ordered," in and of itself operated to breach plaintiff's exclusive dealership agreement. See Proctor v. Union Coal Company, 1923, 243 Mass. 428, 137 N.E. 659; Marnon v. Vaughan Motor Co., 184 Or. 103, 194 P.2d 992; 11 Williston on Contracts § 1323 (Jaeger ed. 1968). If one of these two acts does constitute a breach, inducement to so act is not protected by any competitive privilege. Northeast Airlines, Inc. v. World Airways, Inc., *supra.*

Defendant asserts, however, that even if a breach did occur, the facts before the court clearly demonstrate that it lacked the requisite purpose and knowledge to render it liable. We do not agree. As of September 17, 1970, defendant's president by his own admission (1) had learned of the existence of a contract between plaintiff and Agrati and of the specific termination provision and marketing restrictions included therein; (2) had discussed unavailingly with plaintiff's president the possibility of "obtaining his distribution," presumably through cancellation by plaintiff of its contract; (3) had joined in authorizing attorney Carter and Agrati's house lawyer to explore means of "getting around" the contract so that defendant might receive immediate delivery of mini-bikes; and (4) had discussed the possibility of receiving parts of mini-bikes from Agrati for reassembly by defendant as a method of "getting around" the contract. Thus, as of that date, defendant had knowledge of the existence and relevant provisions of the contract, athough apparently not of the March 26, 1970 default clause; and defendant had knowledge of that clause at least by November 7, 1970 when its counsel met with Agrati's American counsel and others in Philadelphia.

In light of defendant's knowledge, the only remaining issue appears to be that of purposeful inducement. Again, by September 17, defendant had evinced its interest in doing immediate business with Agrati and in freeing Agrati from its contractual obligation to plaintiff to refrain from doing such business. The November meeting in Philadelphia between defendant's counsel and Agrati representatives was similarly directed toward finding a way out of the contract, specifically through the default clause. That both defendant and Agrati foresaw the possibility that the latter's action might lead to liability is reflected by the indemnification provision included in the November 14 agreement.

The most revealing piece of evidence, however, is Agrati's own draft of the November 14 agreement which, if finalized, would have honored its contract with plaintiff. At the very least, this submitted draft should have revealed to defendant the possibility, indeed likelihood, that in Agrati's view no default by plaintiff had occurred.[4] Instead, de-

---

3. In countering defendant's position that Agrati validly called a default, either in its October 16 letter or its November 25 letter, plaintiff has submitted evidence advancing the theories (1) that the parties' course of dealing with regard to letters of credit and shipping dates operated to waive these conditions well in advance of these events, or (2) that Agrati's conduct in October and November indicated a willingness on its part to continue business relations, conduct necessarily negating the implication that the contract was dead for want of compliance by plaintiff.

4. Other evidence also rebuts defendant's reliance upon the alleged default. For example, Bombardier's president, Beaudoin, indicated that he acted upon company counsel Leblanc's report of the November meeting in Philadelphia, at which the October 16 letter raising a default had been discussed. However, since Della

fendant's president stated at his deposition that he prevailed upon Agrati to change this language to provide for immediate delivery "after this date, if and when ordered." Insofar as this changed language itself constitutes a breach by Agrati, there can be no dispute that it is specifically the product of defendant's request. Similarly, if the breach consists of Agrati's refusal to ship mini-bikes to plaintiff, a court or jury could well infer that Agrati's refusal was largely attributable to and made in reliance upon Beaudoin's "explaining" and "reminding" Agrati about its right to call a default under its contract with plaintiff. Thus, in light of the November dialogue and of the other facts outlined above, a finding at trial of purposeful inducement by defendant is likely.[5]

That plaintiff is suffering substantial harm from the disruption of its relations with Agrati is quite evident. In addition to being deprived of an item which it has successfully marketed since 1967, it must compete against the sale of that very item by defendant. Its sales are markedly off from preceding years, and its relations and credibility with its dealers have been seriously strained. These are not the types of harm readily computable or recompensable in money damages.

Defendant argues that plaintiff's losses relate to the general state of the economy rather than to any illegal conduct on its part. This contention is met by affidavits of distributors submitted by plaintiff, each of which concludes that ESI's difficulties stem from the presence of the Bombardier-Agrati product on the market. There is nothing in the record sufficient to rebut this conclusion.

Defendant further argues in effect that an injunction here would be inefficacious since it does not relate to what defendant considers to be plaintiff's primary grievance against Agrati for failure to deal.[6] While agreeing with defendant that it cannot restore plaintiff's business with Agrati, the court nevertheless believes that defendant overlooks its own wrongdoing in focusing upon Agrati's absence. Clearly, an injunction would lie against Agrati prohibiting it from supplying a third party with mini-bikes in contravention either of an exclusive sales agreement, see Nokol Co. of Missouri v. Becker, 1927, 318 Mo. 292, 300 S.W. 1108, 1116, or of a covenant not to compete. See Perthou v. Stewart, D.Oregon, 1965, 243 F.Supp. 655, 658; 11 Williston on Contracts § 1446 (Jaeger ed. 1968). But injunctive relief also is directly available against a third party but for whose unlawful inducement an exclusive sales agreement would not have been breached. See Beekman v. Marsters, 1907, 195 Mass. 205, 80 N.E. 817; cf. E. L. Husting Co. v. Coca Cola Co., 1931, 205 Wis. 356, 237 N.W. 85, 238 N.W. 626. In light of defendant's complicity in and inducement of Agrati's breach, and cognizant of the fact that that breach is continuing only because of defendant's purchase and marketing of Agrati's products, the court views defendant as an abettor of Agrati and has concluded that defendant's conduct is no less wrongful and harmful to plaintiff than that of Agrati and therefore that

Croce also attended that meeting, Leblanc must have been apprised of the October 19 phone conversation between Della Croce and ESI during which future business dealings were discussed *as if the contract remained in effect.* And this would have put Leblanc on notice that any default prior to October 19 probably had been waived.

5. A defendant fully knowledgeable of the relevant facts concerning a contract will not be excused if he is mistaken as to their legal significance. Restatement of Torts § 766, comment (e).

6. Agrati's absence from this proceeding results not only from limitations upon this court's process but also from the contractual agreement by ESI and Agrati in May 1968 to submit all controversies to arbitration. Such arbitration proceedings are currently in progress.

 

defendant is a proper subject for injunction.

Finally, the preliminary injunction which the court hereby orders will not bar defendant from selling all of Agrati's products indefinitely but only "mini-bikes" and modifications thereof for one year and "Broncco" type mini-cycles and modifications thereof for two years, as provided in the ESI-Agrati contract.

So ordered.