**WALT PEABODY ADVERTISING SERVICE, INC., Plaintiff,**

v.

**Rocco A. PECORA et al., Defendants.**

**Civ. A. No. C 74-409 L(A).**

United States District Court,
W. D. Kentucky,
Louisville Division.

Nov. 26, 1974.

Supplemental Findings and Fact
Jan. 7, 1975.

Edwin F. Kagin, Jr., James R. Voyles, Louisville, Ky., Scott L. Mayorga and Henry Harber Rubin, Beverly Hills, Cal., for plaintiff.

F. Larkin Fore, Louisville, Ky., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ALLEN, District Judge.

This action is submitted to the Court on the motion of the plaintiff, Walt Peabody Advertising Service Inc., for a preliminary injunction following a two day evidentiary hearing, the presentation of oral arguments and briefs.

The factual background of this controversy is not too complex. Plaintiff is a Florida corporation engaged in the advertising business, insofar as it pertains to the bowling industry. Plaintiff does business in 48 of the 50 states of this country, and carries on its operations by entering into a very brief one page document entitled "Agreement" with the bowling alleys with whom it does business. Each of these Agreements provides that upon the furnishing of bowling score sheets and similar materials free-of-charge by the advertising agency to the bowling alley, the advertising agency is then authorized to place advertising on the materials which are furnished to the bowling alley and to retain all proceeds therefrom. The Agreement also provides that it will be in effect for 36 months from the date the first shipment of materials is received by the bowling alley, and that it is noncancelable during the three year period and will be automatically renewed thereafter, unless cancelled in writing by either party at least 90 days prior to the expiration of the Agreement.

Plaintiff has been very successful in the operation of its business and has procured Agreements with some 2,800 to 3,000 bowling alleys out of a total of approximately 10,000 doing business in this country. In the City of Louisville, plaintiff apparently had Agreements with 18 of the 22 bowling centers located here, all of which or nearly all thereof having been negotiated by defendants Rocco Pecora and his wife, Mary Jo Pecora.

On October 6, 1974, defendant Rocco Pecora mailed his resignation as Regional Manager of the plaintiff to the plaintiff's main office in Fort Lauderdale, Florida, where it was received on October 8, 1974. His wife, defendant Mary Jo Pecora, left the company at the same time, and within two days she and her husband had procured Agreements, for a firm entitled Action Advertising Associates, Inc., operated by Phil Pecora, a brother of Rocco Pecora, with 14 bowling centers, 13 of which were located in Louisville, Kentucky; 3 of the agreements were dated October 7th, 6 were dated October 8th, 1 was dated October 9th, 3 were dated October 11th, and 1 was dated October 19th.

Each of these Agreements were secured with bowling centers who had previously entered into Agreements with the plaintiff in either 1971 or 1972. With regards to the 1971 Agreements, the majority of them had been entered into in May and would, by their terms, have become automatically renewable in the absence of written notice received at least 90 days prior to their expiration in May, 1974. No such notice had been received by the bowling centers and all of these alleys were being serviced by the plaintiff at the time the defendants solicited their business and succeeded in procuring their Agreements for Action Advertising for periods of 36 months, with the exception of the Bowlarama Agreement which was for 12 months.

At the trial the proprietors or managers of five of the bowling centers testi-

fied as to their reasons for changing their alliance from plaintiff to Action Advertising. By and large the reasons given were to the effect that defendants had previously serviced their business and had done a good job, and were local residents, and therefore entitled to get their business. One of the bowling center managers, Mr. Franz, indicated that he had never seen the Agreement with the plaintiff, and a Mrs. Alvey testified to the same effect. The majority of the owners seemed to be under the impression that they had an absolute right to terminate the Agreements at any time. There was evidence that at least in one instance Rocco Pecora told the bowling lane proprietor that his contract had expired with the plaintiff and was of no effect. Pecora admitted making that statement but contended that he was ignorant of the automatic renewable clauses contained in the Agreements. Suffice it to say that this contention is without merit, inasmuch as he was the Regional Manager of the plaintiff and, for several months, had negotiated the plaintiff's Agreement with the bowling proprietors and had been instructed at a meeting held by the plaintiff in August, 1974 concerning the meaning of the contracts.

Evidence was introduced also to show that bowling alley proprietors, in many instances, do not regard their Agreements with advertising agencies which furnish score sheets to them as binding, except insofar as protection of advertisers who place their advertising on the materials furnished by agencies such as the plaintiff. It should be noted that it is the understanding of the plaintiff and its competitors to enter into advertising contracts for a period of 12 months, as opposed to the 36 month period which obtains for the bowling alleys.

There is also evidence to the effect that plaintiff had instructed its employees to solicit bowling alleys which were under contract to other advertising agencies during the times of their contract, and that it had, in fact, secured business from their competitors during the duration of the competitor's contract.

The evidence also shows that defendant Rocco Pecora had, at the time of his resignation, in his possession certain materials such as the "Person to Person" letters and the "Wanted Now" list, which were considered confidential by the plaintiff and which supplied information as to advertising contracts, dates of expiration of policy contracts, amounts paid by advertisers, and the correct amounts owing to the plaintiffs on the advertisers' contracts. While this information, insofar as it pertained to Louisville, had primarily been compiled by defendant Rocco Pecora, and while it was returned by him to the plaintiff following his resignation, it is apparent that possession of these documents was of some assistance to him in procuring the business of the bowling lanes as promptly as he and his wife did.

The law in Kentucky as to interference of contractual relations has an interesting history, quite dissimilar from that which obtains in the majority of jurisdictions. Originally it was held in Bourlier Brothers v. Macauley, 91 Ky. 135, 15 S.W. 60, 12 Ky.L.Rep. 737 that there was no cause of action stated by plaintiff when he alleged that a rival theatre had induced the famous actress, Mary Anderson, to break her contract with the plaintiff theatre and to appear at the rival theatre instead. While maliciousness or purpose to injure the plaintiff were not alleged, the Court of Appeals held that this was immaterial and that there was no cause of action. This holding was based on the dissenting opinion in the celebrated case of Lumley v. Gye, 2nd El. & Bl. 216, 75 E.C.L. 216. The gist of the dissenting opinion was to the effect that the injured party has his remedy against the other contracting party for breach of contract, whereas the majority held that a party to the contract has a property right therein which a third party has no more right maliciously to deprive him of or injure

him in, than he would to injure his property, and that such an injury amounts to a tort.

In Brooks v. Patterson, 234 Ky. 757, 29 S.W.2d 26 (Ky.1930), the court pointed out that it has not followed altogether the rule in Lumley v. Gye, supra, and it confined recovery of damages to cases involving interference in contractual relations between master and servant, and where a person by coercion or deception has been procured against his will or contrary to his purposes to breach a contract. That opinion goes on to say on p. 762, 29 S.W.2d at 28 that "only those who are parties to or in some manner bound by the contract are liable for breach thereof, although the third party may have been actuated by malicious motives." The observation is then made that in Chambers and Marshall v. Baldwin, 91 Ky. 121, 15 S.W. 57, 12 Ky.L. Rep. 699, the subject is carefully considered and the holding made that "plaintiff could not maintain an action against a person who had procured another to breach a contract to sell and deliver his tobacco to him although such procurement was malicious." The court went on to observe however "that the ground upon which the right so to maintain the action was denied was that the act of defendant was not the direct or proximate cause of the plaintiff's damage, but rather the voluntary act of the seller of the tobacco, who had not been induced to break his contract by either force or fraud."

Close analysis of Brooks v. Patterson, supra, and its reasoning indicates then that in 1930 the rule in Kentucky was that damages may be recovered in cases involving interference in contractual relations only where a person by coercion or deception has been procured against his will or contrary to his purpose to breach a contract. Put in legal terminology, the conduct shown by the third party intermediary was to amount to either duress or fraud.

However, since the decision in Brooks v. Patterson, supra, the cases of Derby Road Building Co., Inc. v. Commonwealth of Kentucky, 317 S.W.2d 891 (Ky. 1958) and Coca-Cola Bottling Works v. Hazard Coca-Cola Bottling Works, Inc., 450 S.W.2d 515 (Ky.1970) have brought Kentucky law in accord with the majority rule which is stated in Alpha Distributing Company of California v. Jack Daniel Distillery, 454 F.2d 442 (9th Cir. 1972) as follows:

"'An action will lie for the intentional interference by a third person with a contractual relationship either by unlawful means or by means otherwise lawful when there is a lack of sufficient justification.'"

quoting Herron v. State Farm Mutual Ins. Co., 56 Cal.2d 202, 14 Cal.Rptr. 294, 363 P.2d 310 (1961).

The majority rule is further set out as containing the following elements: (1) an existing contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) an intentional unjustified inducement to breach the contract; (4) a subsequent breach by the third party; (5) resulting damage to the plaintiff. See Hannigan v. Sears, Roebuck and Co., 410 F.2d 285 (7th Cir. 1969) at p. 291.

In Derby Road Building Co., Inc. v. Commonwealth of Kentucky, supra, plaintiff, a contractor, sued the Department of Highways of Kentucky and several utility companies alleging as to the utility companies that completion of plaintiff's work had been delayed beyond the stipulated date because the utility companies had failed to remove their installations. The trial court entered summary judgment for the utility companies and the Court of Appeals affirmed. In so doing, the court used the following words:

"Ordinarily only those who are parties are liable for the breach of a contract, and the parties cannot impose any liability upon a stranger to the contract under its terms. As strangers to this contract, the utility companies could be held liable only for having wrongfully procured or induced the

Department of Highways not to perform its contract. Such liability is predicated upon an intentional interference, malicious or without justification, with known contractual rights possessed by the party suing to recover damages therefor. Brooks v. Patterson, 234 Ky. 757, 29 S.W.2d 26, and authorities cited therein, Restatement, Torts, § 766."

The Restatement of Torts, § 766, was adopted by the American Law Institute on May 13, 1939, nine years after the decision in Brooks v. Patterson, supra. It states the rule as follows:

"Except as stated in Section 698, one who, without a privilege to do so, induces or otherwise purposely causes a third person not to

(a) perform a contract with another, or

(b) enter into or continue a business relation with another

is liable to the other for the harm caused thereby."

It can be seen by these words that the general principles stated in § 766 of the Restatement of Torts are not in accord with the pre-*Derby Road* holdings of the Kentucky Court of Appeals, which have limited recovery to those cases where breaches of contract were caused by either fraud or coercion. Examination of the analysis contained in § 766 reveals that the significance of Lumley v. Gye, supra, lies in its extension of the rule of liability to nontortious methods of inducing breaches of contract, or interfering with advantageous business relations, even when they were not cemented by a contract. In fact, as pointed out in the analysis, "[t]he liability for inducing breach of contract is now regarded as but one instance, rather than the exclusive limit, of protection against unjustified interference in business relations." Volume 4, p. 52, Restatement of Torts.

On pp. 54 and 55 of Volume 4, Restatement of Torts, a discussion is had as to the meaning of the words "induces or otherwise purposely causes". The annotators state that the word "induces" refers to "situations in which A causes B to choose one course of conduct rather than another. Whether A causes the choice by persuasion or by intimidation, B is free to choose the other course if he is willing to suffer the consequences. Thus, inducement operates on the mind of the person induced." The Restatement goes on to give examples of what does and does not constitute "inducement".

In Coca-Cola Bottling Works v. Hazard Coca-Cola Bottling Works, Inc., supra, while the court made no reference to the teachings of the Restatement of Torts, § 766 et seq., or to any of its previous cases relating to interference or unlawful inducement of breach of contract, it discussed the pleading which sought recovery, among other things, for conspiracy to unlawfully induce a person named Polly to breach a contract, and also sought recovery on the grounds of interference with the performance of the contract. The court merely held that there was an absence of substantive evidence showing that Matthews induced Polly to cancel the contract.

*Coca-Cola Bottling,* supra, is a definite indication that Kentucky has aligned itself with the authorities which hold that it is sufficient to show an unlawful interference with a contract or an inducement to breach a contract to state a cause of action. See Brunswick Corporation v. Vineberg, 370 F.2d 605 (5th Cir. 1967); Hannigan v. Sears, Roebuck and Company, supra; Sinclair Refining Company v. Atkinson, 290 F.2d 312 (7th Cir. 1961), aff'd 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440; Neff v. World Publishing Company, 349 F.2d 235 (8th Cir. 1965); Bank of Utah v. Commercial Security Bank, 369 F.2d 19 (10th Cir. 1966), cert. den. 386 U.S. 1018, 87 S.Ct. 1374, 18 L.Ed.2d 456.

In the instant case, the evidence is clear that the defendants Rocco A. Pecora and Mary Jo Pecora solicited the breach of the contracts, which plaintiff had with 11 bowling alleys or centers,

during a period of approximately two weeks immediately following their resignation from the plaintiff. In addition, there was evidence given by two witnesses, Burton and Robinson, to the effect that some of the contracts which defendants solicited had already been solicited prior to the leaving from plaintiff's employment by these defendants, thus arguably bringing Rocco Pecora within the ambit of the forbidden conduct set out in Aero Drapery of Kentucky, Inc., v. Enghdahl, 507 S.W.2d 166 (Ky.1974). It is clear that regardless of the applicability or nonapplicability of Aero Drapery, supra, that the conduct of the two Pecoras is forbidden by the standards set up in the Restatement of Torts and by the case law set out above. While ordinarily such conduct renders the actors liable for damages, they also subject themselves to injunctive relief under the circumstances of this case. See Beacon Theatres, Inc. v. Westover, 252 F.2d 864 (9th Cir. 1958), at p. 872. While *Beacon* was reversed by the Supreme Court in 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), it was on other grounds and the language contained on 252 F.2d p. 872 in Keynote 4 to the effect "[i]t has long been recognized that a person having an existing contract for the acquisition of property or services or other things of value may have equitable relief by way of injunction against a third person who with knowledge of the contract performs acts designed to induce the breach of the plaintiff's contract" is still persuasive.

As stated in *Beacon*, all that need be proven is that "the attempted interference by the third person with plaintiff's contract and his attempts to induce the other party to the contract to breach it is done intentionally." See Meyer v. Washington Times Co., 64 App.D.C. 218, 76 F.2d 988 (1935). See, also, Bruce Lincoln-Mercury, Inc. v. Universal C. I. T. Credit Corporation, 325 F.2d 2 (3rd Cir. 1963) and Engine Specialties, Inc. v. Bombardier Limited, 330 F.Supp. 762 (D.C.D.Mass.1971), aff'd. 454 F.2d 527 (1st Cir. 1972).

■ For plaintiff to prevail on its motion for a preliminary injunction, there must be demonstrated a probability of prevailing on the merits and a danger of immediate irreparable harm, absent such relief. Automatic Radio Manufacturing Company, Inc. v. Ford Motor Company, 390 F.2d 113 (1st Cir. 1968). Also, plaintiff should show no harm will be done to the public interest by the granting of a preliminary injunction, or to strangers to the action. See Babcock v. Local Board No. 5 for State of Delaware, 321 F.Supp. 1017 (D.C.D. Del.1970).

■ In the case at bar, plaintiff has demonstrated a probability of prevailing on the merits, since it is obvious from the exhibits that were filed at the hearing on the motion for preliminary injunction and from the testimony of the witnesses, that the Pecoras acted with the express purpose of taking away from the plaintiff its contractual customers. Secondly, immediate irreparable harm has been demonstrated under the authorities cited above, since it has been held that the loss of a contractual customer to a third party who induces the breach of the contractual relationship constitutes injury for which injunctive relief shall issue. Thirdly, there is no proof here of any harm that any third person or the public will suffer by the granting of the injunction, since the matter at issue here is the right to enter into contracts between an advertising agency and bowling alley centers and the right to retain such customers under a contract.

■ The defendants asserted in oral argument that plaintiff is foreclosed by the doctrine of "clean hands" from equitable relief. Their argument is predicated on the testimony of several witnesses to the effect that plaintiff, in Kansas and in Florida, had solicited the business of bowling alley customers whose owners are under contract to another party and induced their breach. Defendants here misconceive the meaning of the "clean hands" doctrine. Under the equitable doctrine of "clean

hands", the wrong asserted must have an immediate and necessary relation to the equity which the complainant seeks to enforce against the defendant. See Columbia Gas & Electric Corporation v. United States, 151 F.2d 461 (6th Cir. 1945), motion den. 153 F.2d 101, cert. den. 329 U.S. 737, 67 S.Ct. 48, 91 L.Ed. 636 and National Labor Relations Board v. Fickett-Brown Manufacturing Company, 140 F.2d 883 (5th Cir. 1944).

As to defendant William D. Stutts, it appears that his activities are confined to selling advertising to companies for insertion on bowling score sheets and other displays used for advertising by *Action Advertising, Inc.* Apparently, Stutts does not, himself, go to the bowling alleys and induce their owners and proprietors to breach their contracts with the plaintiff. The same observation seems to be true as to defendant Larry Hoplite, who lives in Lancaster, Ohio, whereas Stutts lives in Nashville, Tennessee.

As to the defendant William L. Swain, an agreed order has been entered to the effect that he be dismissed on the condition that he agree to be bound by the terms of the temporary restraining order entered on November 1, 1974, and to be further bound by the terms of any preliminary injunction this Court may enter in this action. Since Swain has agreed to be bound by the terms of any preliminary injunction, but inasmuch as he has formally been dismissed as a party, the preliminary injunction will not explicitly include him as one of those persons who is enjoined subject to the explicit understanding that he is expressly bound by the terms of the preliminary injunction to the same extent as are Rocco A. Pecora and Mary Jo Pecora.

Finally, the Court has this day prepared for entry the preliminary injunction in accordance with these findings of fact and conclusions of law.

Since the preliminary injunction does not run against defendants Stutts, Hoplite and Swain, it will be necessary for the plaintiff to present a new bond and to bring said bond to the Court for signature before entry of the preliminary injunction.

## SUPPLEMENTAL FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER, AMENDED PRELIMINARY INJUNCTION

On November 26, 1974, the Court entered a preliminary injunction, findings of fact and conclusions of law. On January 3, 1975, a hearing was held, pursuant to motion of the defendants, made in accordance with Rule 52(b), Federal Rules of Civil Procedure, requesting the Court to amend its findings of fact and make additional findings and amend the preliminary injunction.

At the hearing, it was developed that the bowling establishments with whom plaintiff has contracts are interested in three categories of goods or service which plaintiff and its competitors can supply. It is possible, therefore, that a bowling establishment may have a contract with one advertising service for a particular type of goods or service, and with another advertising service for another type of advertising material. It is also possible that the bowling establishment might have contracts with the same advertising service for goods or service as to which the expiration dates of the contracts would differ.

The Court's preliminary injunction was very broadly drawn, and that portion which commenced six lines from the bottom of the first page was drafted because of the Court's belief at that time that the bowling establishments with which plaintiff had contracts did, in effect, have contracts which covered all of the three categories for goods and service which all of the advertising services used and which plaintiff and defendants constantly supply to bowling establishments.

The portion of the preliminary injunction which starts with the word "and" immediately following the word "customers" on page 1, and which ends with

the word "systems" at the top of page 2, is deleted and there is substituted for this provision the following language:

"and provided further, that said persons are further enjoined from soliciting or receiving or attempting to solicit or receive, directly or indirectly, any orders or contracts for goods or services as to which goods or services bowling establishments have a valid contract in effect with the plaintiff, including but not limited to providing and/or supplying paper, and/or plastic score sheets, and/or promotional sign systems."

It is believed that with this clarification and amendment to the preliminary injunction defendants will be able to compete with plaintiff as to those types of goods and services for which the plaintiff does not have a valid contract, even though the plaintiff might have a valid contract with the bowling establishment in question as to a different type of goods or service which, under the terms of the preliminary injunction, as amended, defendant cannot interfere with.

It is so ordered.