**AUTOMATIC RADIO MFG. CO., Inc.**
and
**Automatic Radio Sales, Inc., Plaintiffs,**

**v.**

**FORD MOTOR COMPANY, Defendant.**

**Civ. A. No. 63–387–C.**

United States District Court
D. Massachusetts.

June 28, 1965.

See also, D.C., 35 F.R.D. 198.

Roger P. Stokey, Walker B. Comegys, Jr., Boston, Mass., for plaintiffs.

Claude R. Branch, Conrad W. Oberdorfer, Boston, Mass., and Thayer Fremont-Smith, Boston, Mass., for defendant.

CAFFREY, District Judge.

This matter came on for hearing before the Court upon plaintiffs' motion for a preliminary injunction filed pursuant to

the provisions of 15 U.S.C.A. § 26. The motion seeks an order enjoining defendant Ford Motor Company from the practice of supplying to its dealers certain of its automobiles constructed without openings in the instrument panels for the installation of radios. There is presently pending before the Court an anti-trust action between the parties.

Plaintiffs have been engaged in the manufacture and, through the means of a number of independent distributors, sale of car radios to authorized dealers of the Ford, General Motors, and Chrysler companies. I find that an automobile dealer who wishes to sell a customer an automobile containing a radio has several choices available as to the method of providing the radio. He can order a car from the manufacturer with a factory-installed radio (production method, so-called). He can buy the car without a radio from the manufacturer and later install at his (the dealer's) place of business a radio manufactured and sold by the maker of the particular car. Or he can buy a car from the manufacturer without a radio and later install a radio made by an independent radio manufacturer, such as Automatic, Soundex, or Tenna (successor to Stromberg Carlson).

For many years the manufacturers of the various leading American automobiles, Ford, General Motors, and Chrysler, equipped the instrument panel of their cars with an opening into which either a radio was factory-installed or over which a so-called "knockout plate" was placed. Several knockout plates were introduced in evidence. I find that these are coverings for the opening into which an automobile radio can be fitted through the instrument panel and that these plates may be removed by a competent mechanic in a matter of a minute or two either by unscrewing a nut and bolt combination or by some other simple method. Once this plate is removed a car radio can be installed by a competent mechanic in approximately 15 or 20 minutes.

Plaintiffs' claim for injunction is based upon the allegation that Ford deliberately designed the instrument panel of its 1965 Galaxie and Fairlane models in such a way as to eliminate the use of a conventional knockout plate and to substitute therefor a frame or metal mask and solid plastic lens which must be removed, discarded, and replaced by a lens with an opening in it to allow the radio to pass through a new lens made with an opening. Plaintiffs also complain that because of the arrangement of a hood over the upper portion of the instrument panel and the location of a so-called "chin" around the lower portion of the instrument panel, all of these items must be removed incidental to the installation of a car radio at a new car dealer's garage, with the result that the time required to install a car radio in the complained of Ford models, Galaxie and Fairlane, has been increased excessively, with the consequence that the increased mechanic-time necessary to install a radio at a dealer's place of business has so greatly increased the cost of so doing to the Ford dealers that this, in turn, has forced the Ford dealers to eschew the use of dealer-installed radios and so substantially increase the number of factory-installed radios, all to the prejudice of the sales of car radios by plaintiffs and other "independents."

It is not contended by plaintiffs that any objectionable arrangement or departure from the normal "knockout plate" was utilized by Ford in the 1965 Mercury, Falcon, Comet or Mustang models. However, plaintiffs have asserted in support of their motion for injunction, through brief and oral argument, that if Ford be not enjoined at this time from the use of the objectionable type mask and lens arrangement it will be extended by Ford to the 1966 Mercury, Falcon, Comet and Mustang models.

Damon C. Woods, Chief Stylist for the Ford Motor Company, testified, and I find, that the instrument panels for the 1966 Mercury, Falcon, Comet and Mustang models have already been designed, and that all four model lines are retaining the conventional knockout plate in the 1966 models. Plaintiffs offered no rebuttal evidence at this point. Consequently I find

that plaintiffs' claim that the alleged change will occur in these 1966 models is without foundation in fact.

Plaintiffs also asserted in support of the motion that they have reasonable grounds to believe that unless Ford is enjoined herein General Motors and Chrysler will eliminate the use of conventional knockout plates in their 1966 cars and thereby render more difficult dealer-installation of car radios in General Motors and Chrysler products. Upon the basis of the testimony given on cross-examination of plaintiffs' principal executive officer, the only witness who testified as to these rumored changes by General Motors and Chrysler, I find that neither he nor plaintiffs have any factual basis whatsoever for the claim as to what changes, if any, General Motors or Chrysler will make on their 1966 models.

With regard to plaintiffs' claim that the changed interior of the Galaxie and Fairlane 1965 models [1] has so grossly increased the installation-time necessary as to, in effect, exert illegal economic duress on Ford dealers to buy factory-installed radios rather than go to the expense of having their own mechanics install them, and thereby to stop or greatly reduce purchases from plaintiffs, I find that there is no substance to this claim. The Court, with counsel and representatives of the parties, went to the Dario Ford agency in South Boston during the course of the hearing, and there watched a 19-year-old mechanic, with one year's experience, install one of plaintiffs' radios, with antenna, in a 1965 Galaxie station wagon in 29 minutes. Defendant filed more than a dozen affidavits from Ford dealers to the effect that radios can be installed in the 1965 Galaxies and Fairlanes in times ranging from 21 minutes to 60 minutes. Six said "less than 40 minutes" and six said "less than 50 minutes." The 19-year-old mechanic installed another of plaintiffs' radios, with antenna, in a 1965 Ford Falcon containing the conventional knockout plate in 12 minutes.

There was testimony adduced at the trial that Ford and General Motors in the regular course of their business issue manuals for the guidance and instruction of their dealers and that these manuals contain time allowances on the basis of which the dealer is entitled to back-charge either Ford or General Motors for certain work done at the dealership which is covered by the new car warranty given out by the manufacturer. I find on the basis of the testimony of the witness Oakes, whom I find to be a credible witness, and who is employed as a service engineer in Ford's New Model Service Procedures Unit, that the Ford Motor Company allows a Ford dealer 8/10ths of an hour (48 minutes) to install a car radio in a 1964 Galaxie, Fairlane or Fairlane 500; and 1.2 hours (1 hour and 12 minutes) to install a car radio in a 1965 Galaxie, Fairlane or Fairlane 500. I further find that these times are computed by timing installation times by what Mr. Oakes believed to be typical Ford mechanics and that these time allowances actually are higher than the actual average installation time, since they also include a 5 per cent mechanic's personal allowance (for personal time not spent on the job), plus a 20 per cent allowance to adjust differences between dealers in equipment, facilities, efficiency, caliber, and training of mechanics.

I further find that Mr. Oakes used a stopwatch and timed mechanics at Ford agencies as having installed radios in the 1965 Galaxie and Fairlane models in 8/10ths and 9/10ths of an hour respectively (48 and 54 minutes respectively), actual installation time without an allowance, and that he has timed a mechanic making his first installation in any 1965 car at 8/10ths and 9/10ths of an hour respectively without an allowance.

I further find that the manuals issued by General Motors showing the time for

---

1. The instrument panels of the 1965 Galaxies and Fairlanes differ somewhat in design and construction but both lack conventional knockout plates and are treated as equals for purposes of this motion. Plaintiffs supply the necessary conversion pieces as part of their radio kit for both Galaxie and Fairlane for 1965.

installing car radios in 1964 and 1965 Chevrolet models was 1.1 hour and in Buicks for both years it was 1.3 hours, without allowances. The time provided in the Chevrolet and Buick manuals for installation, with allowances, is 1.4 hours for 1964 and 1965 Chevrolets and 1.6 hours for 1964 and 1965 Buicks. On the basis of the foregoing, I find that the time allowed by Ford to dealers for installation of car radios in 1965 Galaxies and Fairlanes is less than the time allowed by General Motors to Buick and Chevrolet dealers for installation of radios in 1964 and 1965 Buicks and Chevrolets, both of which models are equipped with the conventional knockout plates. The significance of these allowances lies in the fact that they are obviously considered to represent reasonable times for dealer-installation of car radios by the major manufacturers who allow themselves to be back-charged by their dealers on the basis thereof.

In sum, I find that even with the complained-of change in the 1965 Galaxies and Fairlanes, the time required to install an automobile radio at a Ford dealership is less than the time General Motors allows Buick and Chevrolet dealers to install radios in cars with conventional knockout plates. I find it significant that plaintiffs have made no complaint about the time required to install car radios in Chevrolets or Buicks and yet complain about Galaxies and Fairlanes.

With regard to the question of time necessary to install a car radio at a Ford dealership, I do not credit the testimony of the witness Blotnick, a 59-year-old man called by the plaintiffs as an expert in radio repair, who testified that it took him 1¾ hours the first time and about 1½ hours the second time he installed a car radio in a 1965 Galaxie, without antenna. In rejecting this testimony I have in mind that the Court witnessed a 19-year-old mechanic completely install the radio, speaker, and antenna in 29 minutes. I also have in mind that if the young mechanic's time was doubled it would still be substantially less than that testified to by the witness Blotnick.

Even if it be assumed in plaintiffs' favor, that the mechanic observed by the Court was unusually skilled, which he did not appear to be, it does not follow that a competent mechanic enjoying more than the one year's experience the demonstrator had, would require more than 15 or 20 minutes over the 29-minute installation observed at Dario Ford. In short, plaintiffs have failed to prove that the change in the interior of the 1965 Galaxie and Fairlane models has caused any unreasonable or extraordinary increase in the length of time necessary for dealer-installation of a car radio.

Other evidence introduced at the hearing indicates that the automobile industry is enjoying a banner and possibly its best year in terms of unit sales, that this increased activity has placed a heavy burden on dealer service facilities in preparing cars for delivery to customers, and that this in turn has caused many dealers to resort to factory-installation of radios and many other accessories in the interest of saving the time of their service personnel. This finding is bolstered by the testimony of the witness Redd, manager of Parts and Services, Research and Analysis Department, Ford Motor Company, who testified that, nationally, Ford dealerships are 30 per cent undermanned in their service departments, and also by the fact that industry figures show that there has been a marked increase in the percentage of power brakes which are factory-installed on the 1965 Ford models despite the fact that the time required for a dealer to install power brakes on 1965 cars is only half the time required to install them in 1964 cars.

Also corroborative of the finding that there is no significant causal relationship between the interior changes in the Galaxies and Fairlanes and the increased percentage of cars being sold this year with factory-installed radios, is the fact that as a matter of statistics Ward's Automotive Reports (referred to by counsel for both parties as the bible of the industry) indicates that many of the automobile lines which contain the conventional knockout plates in their 1965

models nevertheless are being sold to dealers in substantially larger numbers containing factory-installed radios. Thus, it appears from two extracts from Ward's Automotive Reports, which were introduced into evidence, that the percentage of factory-installation of car radios in the 1965 models through March 31 of this year has increased in very many, if not all, ·of the major makes of automobiles which are delivered equipped with the conventional knockout plate. Ford Falcon is up from 48% to 59.8% factory-installed; Mustang up from 77.8 to 79.6%; Mercury from 76.6 to 83.9%; and Comet from 53.2 to 61.8%. Turning to the General Motors line, it appears that Chevrolet is up from 56.7 to 70%; Chevelle up from 57.0 to 67.6%; Chevie II from 43.5 to 55.6%; Corvair from 57.8 to 69.3%; and Pontiac, Tempest, Oldsmobile, F–85, Buick, and Buick Special are all up a few percentage points. In the more expensive lines for both 1964 and 1965, factory installation of radios for Cadillac is 99.4%, and for Lincoln and Thunderbird 100%.

Returning to car lines competitive with Ford, from 1964 to 1965 Plymouth is up from 56.8 to 74.7 for Fury, 58.7 for Belvedere, and 77.1 for Barracuda. Valiant is up slightly. Dodge Dart is up from 51.1 to 61%, Chrysler is up from 77.7 to 89.3%, and the top of the Chrysler line, Imperial, is up from 98.8 to 99.2%. Finally, American Motor's Rambler is up from 36.9 to 44.4%. These statistics show that there is no decrease in factory-installation as to any of the above-named makes of cars, all of which contain conventional knockout plates, and that as to Chevrolet and Plymouth, Ford's principal competitors, there is an increase in factory-installation of radios in the 1965 models of approximately 13% as to Chevrolet, 17% as to Plymouth Fury, and 20% as to Plymouth Belvedere, even though all of these cars are equipped with the conventional knockout plates. There is no suggestion, much less evidence herein, that the increase in factory-installation of radios in 1965 Chevrolets and Plymouths is the product of any pressure from General Motors or Chrysler.

██ I am not satisfied that plaintiffs have shown that Ford made the changes complained of for the purpose of aiding its own sales of factory-installed radios or to injure the business of plaintiffs and others similarly situated, nor that Ford's 1965 design changes substantially or unreasonably increased installation time in any event.

Plaintiffs have also failed to prove that by reason of the conduct that has occurred thus far they have suffered anything remotely approaching irreparable damage. Their protestations have been loud and long and their proof soft and short. They have not clearly shown what financial changes they have suffered since the beginning of the 1965 car season. They have not shown that whatever these consequences may be they are proximately caused by any wrongful conduct of defendant. They have not shown what, if any, effect the conduct complained of has had on their employee situation, and they admit that they have not lost any one of their fifty distributors.

██ Plaintiffs charge in paragraph 12 of their motion that Ford's conduct is in violation of sections 1 and 2 of the Sherman Act and section 3 of the Clayton Act. I rule that the evidence which plaintiffs have adduced at this hearing does not lay a sufficient predicate for any finding that Ford may have violated Section 2 of the Sherman Act. Nor is there any merit in plaintiffs' position herein that Ford's changed design *per se* amounts to an illegal tie-in device and, therefore, a violation of Section 3 of the Clayton Act and Section 1 of the Sherman Act.

The language of both statutes limits the application of these sections to contractual arrangments. This is quite clear as to the Clayton Act, both from the language of the statute itself and from its legislative history. The focus is on contracts which embody certain restrictive conditions, agreements or understandings.

The vast bulk of the case law on tying arrangements is consistent with and demonstrative of this view as to the permissible limits of meaning of the statutory language defining illegal tying devices. See, e. g., Northern Pacific R. Co. v. United States, 356 U.S. 1, 5–6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); Susser v. Carvel Corporation, 332 F.2d 505, 512 (2 Cir. 1964), cert. dismissed 85 S.Ct. 1364 (1965) ("A tying arrangement may be defined as an *agreement* under which the vendor will sell one product only if the purchaser *agrees* to buy another independent product as well." Emphasis supplied.)

While it may be true, as plaintiffs assert in their brief at page 9, that an *express* contract is not required in order to constitute a tie-in sale under either section 1 of the Sherman Act or section 3 of the Clayton Act, it does not follow that the practical effect of the activity or conduct challenged is determinative without regard to whether this effect is accomplished by means of contractual limitations on the freedom of action of lessees, vendees, or, as in the present case, persons technically the latter but of a subtype that are pretty much *sui generis*.

Plaintiffs rely heavily on Osborn v. Sinclair Refining Co., 286 F.2d 832, especially at 836–837, (4 Cir. 1960), cert. denied 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255 (1961), and Lessig v. Tidewater Oil Co., 327 F.2d 459 (9 Cir. 1964), cert. denied 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). These cases are not controlling either because they involved proof (not yet present in this case) which might allow a finding that there could reasonaly be implied-in-fact a provision or term in a contractual relationship that was restrictive of trade or because the conduct of the tying party was at least effectuated by use of a pre-existing contractual relationship or because these cases involve an unwarranted extension of the notion of what constitutes a tying clause by virtue of *fictional* implication or "construction" of supposedly contractual terms or provisions.

Ford's conduct in redesigning its instrument panels was independent of its contractual dealings with its dealers. It was not a matter as to which it consulted them or bargained with them in any way. Ford's ability to engage in such unilateral action and call the tune as to what its car designs shall be does not alter the fact that Ford has not been shown to be engaging in restrictive contractual practices within the scope of the statutes relied on by plaintiffs.

Furthermore, it is difficult realistically to describe the Ford instrument panels as anything other than integral components usually found in automobiles designed for the run of the consumer trade. Thus it is hardly possible to view Ford as forcing on its dealers by contracts of adhesion an item which is not a component part of a car in order to force them also to take radios as accessories. Ford can hardly be accused of tying (in a legal sense) instrument panels to its cars by contract in order to reach the desired goal of tying radios too.

The nub of plaintiffs' claim herein is the contention in their reply brief that "the Ford dealer is not free to make a choice. The dashboard device exerts an economic pressure which limits his freedom of choice." This position is not tenable on the record of this case for two reasons. First, plaintiffs have not sustained their burden of proving this contention as a question of fact, and second, plaintiffs have erroneously assumed that the mere unilateral exertion of economic pressure, regardless of the means utilized, amounts to a proscribed tie-in device, overlooking the observation of the Supreme Court in a very recent decision, Atlantic Refining Co. v. F. T. C., June 1, 1965, 85 S.Ct. 1498, at 1506, "It has long been recognized that there are many unfair methods of competition that do not assume the proportions of antitrust violations." [2]

2. This quotation from the Supreme Court's opinion is not to be taken as a finding or ruling by this Court that Ford's conduct has been shown herein to be unfair.

Plaintiffs have established that a not insubstantial amount of commerce is affected by the business activities of the parties herein.

 Finally, plaintiffs have not shown a likelihood that they will prevail on the merits of the main portion of this case, which is another of the conditions normally precedent to the granting of a preliminary injunction under Section 26. In short, plaintiffs have failed to sustain the heavy burden which a movant for an injunction must carry under the provisions of Title 15 and the applicable principles of equity jurisdiction.

The motion for preliminary injunction is denied.