**AUTOMATIC RADIO MFG. CO., Inc., et al., Plaintiffs, Appellants,**

v.

**FORD MOTOR COMPANY, Defendant, Appellee.**

**No. 7021.**

United States Court of Appeals
First Circuit.

Heard Jan. 3, 1968.

Decided March 5, 1968.

---

Worth Rowley, Washington, D. C., with whom Roger P. Stokey, Walker B. Comegys, Jr., Goodwin, Procter & Hoar and Englander, Englander & Englander, Boston, Mass., were on brief, for appellants.

Claude R. Branch, Boston, Mass., with whom Conrad W. Oberdorfer, Thayer Fremont-Smith, Boston, Mass., Richard B. Darragh, Dearborn, Mich., and Harvey S. Kronfeld, Philadelphia, Pa., were on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

This is an appeal from a denial of a preliminary injunction sought by a manufacturer of automobile radios, Automatic Radio Mfg. Co., Inc. (Automatic),[1] against Ford Motor Company (Ford), to restore its competitive position in the automobile radio market pending the outcome of a private antitrust suit seeking treble damages and injunctive relief under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, for alleged violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and section 3 of the Clayton Act, 15 U.S.C. § 14.

Automatic is a substantial manufacturer of custom car radios adapted to fit into the dashboards of particular models and makes of automobiles. Its radios are designed for use in most of the models of the major United States automobile manufacturers. Its immediate customers are distributors who resell the radios to new car dealers. In the instant case, its ultimate customers are Ford car dealers. For years its radios and installation kits have been sold to many of these dealers, particularly in the eastern part of the United States, for approximately $10 less than the cost of a Ford radio installed at the factory.

Until 1964, each Ford model had the same basic instrument panel whether the car was equipped with a radio or not. If an automobile was ordered without a factory installed radio, the opening for the radio was covered by a "knockout plate". The dealer could easily remove the plate and, using the accessories contained in kits, install either a Ford radio or one manufactured by appellant or other producers. In the fall of 1964 Ford changed its dashboard styling in two of its models. In cars equipped with factory installed radios a 27 inch wide plastic dashboard cover, with openings for various dashboard gauges and radio knobs, buttons and dial, was used. In cars ordered without radios, the same plastic dashboard cover was used except that it was partly imperforate; it had no openings masked with a "knockout plate" where a radio would otherwise be located. If a dealer wished to install a Ford radio, the perforated cover, with holes for a radio, would be furnished with the installation kit without extra charge. If a dealer wished to buy a perforated cover separate from a kit, the

---

1. A wholly owned sales subsidiary, Automatic Radio Sales, Inc., is also a plaintiff-appellant.

price ranged from $5 to $7.67.[2] With the introduction of the 1967 Mercury and Deluxe Comet, Ford extended its styling changes and used a different kind of imperforate cover, apparently more difficult to duplicate.

While the inclusion of a perforated cover free of extra charge in the Ford installation kit reduced or in some cases eliminated the price advantage previously enjoyed by Automatic, appellant complains that it is further prejudiced by the time and expense necessary to tool up for and produce its own replicas of Ford's perforated covers. This delay allegedly causes it to miss out on the lucrative first sales months of the automobile year or, in the case of the Mercury and the Comet, to lose sales for the entire year. Automatic complains not only that its sales of radios for Ford cars have been cut in half, and its profits on these sales converted into losses, but also that it has lost its good will as a reliable full line custom radio supplier. It further alleges damage to the consuming public in the erosion of the competition it has hitherto contributed.

The injunction sought by Automatic would require Ford, upon request of its dealers, to deliver automobiles without radios but with perforated dashboard covers and to issue order forms to provide for the ordering of automobiles so equipped. The district court found (1) that Automatic did not establish a causal relationship between Ford's dashboard changes and its own declining sales; (2) that it did not demonstrate that adequate monetary compensation would be impossible or extraordinarily difficult; (3) that the relief requested might prove "nugatory" or ineffective in achieving any relief; and (4) that supervision of Ford's 7,200 dealers might render enforcement of a decree too difficult. It concluded that the circumstances did not justify the mandatory form of decree requested and that the existence of an illegal tying arrangement had not been established. It said nothing as to alleged Sherman Act violations.

■■ Automatic, in prosecuting this appeal, bears a heavy burden. It must show either a clear error of law or an abuse of discretion by the district court in denying the injunction. Bowling Mach., Inc. v. First Nat'l Bank of Boston, 283 F.2d 39, 43 (1st Cir. 1960). More specifically, appellant must show error or abuse of discretion in refusals to find (1) that Automatic had demonstrated a danger of immediate irreparable harm absent such injunctive relief, 15 U.S.C. § 26; (2) that Automatic had shown a probability that it would prevail on the merits, Imperial Chem. Indus. Ltd. v. National Distillers & Chem. Corp., 354 F.2d 459, 461 (2d Cir. 1965), but see Hamilton Watch Co. v. Benrus Watch Co.,

2. Although the record contains somewhat varying cost estimates, the following table gives an approximate comparison of costs and profits to the dealer when he buys a Ford factory installed radio, installs a Ford radio, and installs an Automatic radio.

| | AUTOMATIC KIT | FORD KIT Lots | | | FORD FACTORY INSTALLED |
|---|---|---|---|---|---|
| | | 1–9 | 10–99 | 100 or more | |
| Radio kits | $28.50 | $42.95 | $39.95 | $34.95 | $45.45 |
| Installation— antenna | | | | | 1.75 |
| Perforated plate | 5. to 7.67 | | | | |
| Installation— labor | 3. (approx.) | 3.00 | 3.00 | 3.00 | |
| Cost to dealer | $36.50 to $39.17 | $45.95 | $42.95 | $37.95 | $47.20 |
| Cost to customer | $58.50 | $58.50 | $58.50 | $58.50 | $58.50 |
| Cost to dealer | 36.50 to 39.17 | 45.95 | 42.95 | 37.95 | 47.20 |
| Profit to dealer | $22.00 to $19.33 | $12.55 | $15.55 | $20.55 | $11.30 |

206 F.2d 738, 740 (2d Cir. 1953); and (3) that a decree requiring some affirmative action by appellee was justified, Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, Inc., 268 F.2d 569, 574 (3d Cir. 1959).

This case has long been aborning.[3] It is time that the merits be tested. We dispose of this appeal on the narrow ground that Automatic has made no compelling case of immediate irreparable injury. Moreover, the allegations and affidavits are not such as to convince us of such a strong probability of success on the merits that we should apply a less stringent requirement of proof of irreparable injury. See generally Developments in the Law—Injunctions, 78 Harv. L.Rev. 994, 1056 (1965). By so saying, we do not mean to imply that Automatic's claims are insubstantial and frivolous.

We take Automatic's claims of injury warranting injunctive relief in reverse order. As for the public, two arguments are made. The first is that Automatic's continued access to Ford dealers without the barrier of the recent marketing practices is a prerequisite to "meaningful price competition". The second, and related, argument is that treble damages are a cheap price to pay for the elimination, pendente lite, of this competition and obtaining a monopoly in the supply of car radios. As to the first contention, the affidavits of the Ford dealers almost uniformly avow that, whatever the source of radios installed in Ford cars, the price of the radio to the consumer is the same.[4] Even if, however, we take note of the likelihood that dealers who realize a greater margin of profit by using an Automatic radio have

more to "play with" in offering a better price, particularly on trade-ins, the second argument is unrealistic in failing to take into account the fact that Automatic, if successful on the merits, would be entitled to permanent injunctive relief which would permit competition to revive.

Automatic next asserts that its good will as a reliable full line supplier of custom radios to Ford dealers is in jeopardy. It phrases the question as "whether money damages can adequately compensate appellants for lost competitive position and terminated business relationships." Were Automatic a consumer-oriented enterprise in the sense that its sales depended upon consumer consciousness of its product's availability or non-availability, we might be sympathetic to this claim. But Automatic's immediate customers are distributors who sell to dealers, who, in turn, seek Automatic's product because it is a lower cost product, yielding them a greater profit. This is not the situation faced in cases like Bergen Drug Co. v. Parke, Davis & Co., 307 F.2d 725 (3d Cir. 1962), or McKesson & Robbins, Inc. v. Charles Pfizer & Co., 235 F.Supp. 743 (E.D.Pa. 1964), where inability to supply "a full line" of products causes the purchaser to shift his business permanently to other suppliers. Here, all non-Ford suppliers are treated alike. And, here, the basic pricing situations strongly suggest that, should Automatic ultimately prevail on the merits, the status quo ante would be quickly restored to the extent that price advantage remained a critical consideration. In short, we see "good will" in this situation the result of a very mercurial market—a market geared to the com-

---

3. The complaint was filed on April 26, 1963. Thirteen months later, Ford's motion for summary judgment was denied. Automatic Radio Mfg. Co. v. Ford Motor Co., 35 F.R.D. 198 (D.Mass.1964). In September 1964, Automatic sought a preliminary injunction, which was denied in June 1965. Automatic Radio Mfg. Co. v. Ford Motor Co., 242 F.Supp. 852 (D. Mass.1965). A year and one half later, in February 1967, Automatic sought the pre-

liminary injunction here at issue, which was denied in September 1967. We are, therefore, still dealing with preliminaries after nearly five years of motions, affidavits, briefs, and hearings.

4. We do not say that benefits to dealers are not in the public interest. Our observation is directed only at the weight to be assigned, in this context, to appellant's "public interest" contention.

peting advantages of price and demand for service space and personnel rather than the attractiveness to the ultimate consumer of a trade name which he seldom sees.

Finally we come to Automatic's claim that

"* * * the district judge, in leaving [Automatic and Automatic Radio Sales, Inc.] to their remedy in damages, put them in a position of having their rights governed by the speculation of a jury. The amount of the damage being inflicted on appellants by Ford's marketing practices is not precisely calculable, for it is measured by the profits appellants would have made but for Ford's wrongdoing, and those profits in turn must be determined by a jury on the basis of expert testimony that is almost certain to be conflicting."

We have long since crossed the bridge of precision of proof of causation and extent of damages in antitrust cases. In Momand v. Universal Film Exchanges, Inc., 172 F.2d 37, 42 (1st Cir. 1948), cert. denied, 336 U.S. 967, 69 S.Ct. 939, 93 L.Ed. 1118 (1949), we recognized that "* * * in an antitrust suit, covering as it must many imponderables, rigid standards of precise proof would make a plaintiff's task practically hopeless." We emphatically ratified this approach in Haverhill Gazette Co. v. Union Leader Corp., 333 F.2d 798, 804–806, n. 16 (1st Cir.), cert. denied, 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343 (1964). See generally Private Treble Damage Antitrust Suits: Measure of Damages for Destruction of All or Part of a Business, 80 Harv.L.Rev. 1566, 1572–74, 1583–84 (1967).

In the meantime, we note that there is no danger of Automatic's demise. Its overall sales, profits, and number of distributors have increased. While such a posture does not negate the possibility that Ford has deprived appellant of lost profits or has caused losses in its business with Ford dealers, it is relevant to the question whether ultimate monetary compensation is likely to be an adequate remedy.

In conclusion, while we do not mean to forejudge the substantial and novel question involving disputed evidence of motivation and causation of Ford's increase and Automatic's decline in sales, we do not feel so compelled by the case made on the affidavits and exhibits as to require, pending trial, cessation of the styling and marketing practice which Ford has pursued for the past three and one half years.

Affirmed.