**BOSTON SHIPPING ASSOCIATION, Inc.**

v.

**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION (AFL–CIO) and its Local 1066 et al.**

**Civ. A. No. 72–632.**

United States District Court, D. Massachusetts.

Feb. 2, 1972.

Leo F. Glynn, Glynn & Dempsey, Boston Mass., for plaintiff.

Joseph T. Doyle, Boston, Mass., for defendants.

MEMORANDUM and ORDER

CAFFREY, Chief Judge.

This matter came on for hearing on petitioner's application for a mandatory injunction requiring the respondents (1) to perform certain clerical functions with reference to the off-loading and re-loading of a Portuguese vessel then tied up at the John F. Moran Terminal, and (2) to cease and desist from what petitioner alleges to be a work stoppage. The petition also alleges that conduct of respondents amounts to a breach of contract and to a failure to comply with a preliminary injunction entered by this Court on December 9, 1971, in Civil Action No. 71–2754–C, which civil action was brought by the United States under the provisions of the Taft-Hartley Act, 208 Labor Management Relations Act, 1947, 29 U.S.C.A. 178.

A hearing was held by the Court on January 31 and February 1, 1972, at which four witnesses testified in support of the petition, supplemented by three rebuttal witnesses, and five witnesses testified on behalf of the respondents. In addition, documentary exhibits were tendered by both parties.

On the basis of all the evidence, I find and rule that for some years the Massachusetts Port Authority (hereinafter MPA), which recently completed the building of the John F. Moran Terminal for the handling of containerized cargo at a cost of $15,000,000, has been investing considerable time and money in attempting to promote the use of the Port of Boston by various steamship lines in lieu of the Port of New York or other competing East Coast ports. I find that on or about January 7, the MPA succeeded in signing a contract with the Portuguese Steamship Line. On the basis of testimony that the original of the contract is in Portugal, a photostatic copy of the first nine pages thereof was

admitted in evidence. This contract obligates the MPA to supply berthing facilities for container vessels at the John F. Moran dock and also to supply labor, supervision and material-handling equipment for the carrier and to provide stevedoring services and terminal services. The contract also requires the Portuguese Steamship Line to use the MPA and its only contractor in the Port of Boston area for stevedoring and terminal services.

On or about January 27, a vessel of the Portuguese Line, the STOLLER GRUNDE, arrived at the Moran dock. This vessel is equipped only to carry containerized cargo which can be on-loaded and off-loaded through the use of a dockside crane. The vessel has no booms of its own. When it arrived, the vessel was carrying 20 containers to be off-loaded, and it was the contemplation of the Portuguese Line and the MPA that a number of empty containers would be on-loaded as well as several containers which were sent to Boston for carriage on this vessel by Texas Instruments, Inc., from a plant of that company located in the State of Rhode Island. This shipment by Texas Instruments through the Port of Boston would have been the first outgoing shipment the MPA has been able to arrange. An affidavit filed today establishes that the STOLLER GRUNDE refused to wait any longer in Boston for the resolution of the instant labor dispute by either the parties or this Court, and on the afternoon of February 1 she sailed from Boston to New York without off-loading the 20 containers consigned to Boston area consignees. As a result of this, the 20 containers will now have to come over the road from New York to Boston.

Were it not for the making of the MPA–Portuguese Line contract on January, 7, Texas Instruments would have made arrangements to ship out these containers through the Port of New York. One of the major problems in the successful operation of the Port of Boston is the imbalance between incoming freight and an almost total lack of outgoing freight. This imbalance, or one-sided traffic, has been a serious handicap to efforts to induce other ship lines to use the Port of Boston.

Additionally, the MPA and the Portuguese Line anticipated that containers of rag waste would also be loaded on the STOLLER GRUNDE. The rag waste, amounting to approximately 300 tons, is located on the Hoosac Pier, another facility owned and operated by the MPA. Prior to the arrival of the Portuguese vessel there were approximately 32 empty containers standing on the Hoosac Pier. In the trade, the filling of containers is called "stuffing" and the emptying of containers is called "stripping." See Respondents' Ex. A, p. 72, Article XVI.

The instant controversy has as one of its principal elements whether or not the procedure sought to be employed by the MPA, whereby containers would be stuffed at the Hoosac Terminal, using the clerical setup of B. S. Costello, and then delivered to the Moran facility using the clerical setup of Terminal Services, Inc. (hereinafter TSI), is consistent with prior practice and custom on the Boston waterfront. MPA was required to obtain its clerical help from TSI, another member of the Boston Shipping Association, because of the refusal of Local 1066 to allow the MPA to employ clerks directly although requested to do so. I find that the practice existed on the Boston waterfront prior to present events, under which practice, at least where a change of terminal agent was made, containers were transferred by one terminal operator from his pier and were accepted by a second terminal operator at his pier, each terminal operator using only his own set of clerks and there being no requirement that the first or transferring terminal operator employ a clerk setup separate from and in addition to the clerk setup already working at the second or transferee terminal.

I further find that the procedure under which the parties-plaintiff attempted to arrange for the transfer of con-

tainers, both full and empty, from the B. S. Costello facility at Hoosac Pier to the TSI at the Moran Pier, was consistent with the above practice. In so finding, I accept the testimony of the witnesses Soules, Itz and Curran, called by plaintiff, and business agent McNamara of Local 1066 called by respondents, to the effect that such a practice was followed when there was a change in the identity of the terminal operator or the cessation of operations in the Port of Boston by an existing terminal operator. I further find that the contract of January 7 between the MPA and the Portuguese Steamship Line constitutes a change in identity of the terminal operator in Boston for the Portuguese Line as to containerized cargo, which is the subject matter of the instant controversy. Both parties are in agreement that the effect of the new contract is to create a situation in which the Portuguese Line has two separate terminal operators and agents in Boston. The MPA is its agent with regard to containerized shipments and B. S. Costello remains its agent for all break-bulk cargo.

It is likewise clear that the Portuguese Line is the first shipping company to have separate terminal operators and agents for the two types of cargo.

I find that the economic nub of the instant controversy is that if the Union's position were adopted and made mandatory upon the terminal operators, the shippers would be required to employ a second clerical setup of six men for a period of nine or ten working days to do the clerical work in connection with the loading or unloading of containers, the performance of which clerical work would not require more than twelve house of actual work.

There was no evidence adduced at the hearing on the basis of which a finding could be made that it was the usual and customary practice in the Port of Boston in situations where one terminal operator replaces another, as here, to pay employees compensation for 480 hours work for a job that could be done in twelve

hours. After this substantial discrepancy between the position of the parties was made a matter of record by the answers of the witness Curran to questioning by the Court, not only did respondents in the course of calling their witnesses not challenge Curran's testimony on this point but, on the contrary, McNamara, the business agent for Local 1066, by indicating that an offer was made on the part of the Local to reduce the size of the clerical setups to some extent affirmatively corroborated Curran's testimony in this regard.

There was sharp controversy at the hearing as to whether or not representatives of the MPA and other members of the Boston Shipping Association, including executives of TSI and executives of B. S. Costello, advised members of Local 1066, and business agent McNamara in particular, of the signing of the new contract between the MPA and the Portuguese Steamship Line. I find that McNamara and other members of Local 1066 were advised of the new contract prior to January 17. This finding is corroborated by the fact that the Chief Clerk at the Moran facility singled out from other trailer trucks arriving at the Moran terminal, the trailer truck carrying out-bound cargo of Texas Instruments, Inc., and refused to process it solely because it had originated from the Hoosac Pier. I reject as not credible the testimony of the witness Riggs, and witnesses McNamara and Mahoney, that their reason for requiring an additional setup on behalf of B. S. Costello at the Moran terminal was their belief that Costello was the agent for the STOLLER GRUNDE. In rejecting this claim I have in mind that subsequent to the testimony of Soules on the afternoon of January 31, during which McNamara, Mahoney and Riggs were present and heard him testify that the MPA and not Costello was the terminal operator and agent for the STOLLER GRUNDE, they did not abandon their insistence on an additional separate setup but, on the contrary, are still persisting in it, as a result of which insistence I find that the

STOLLER GRUNDE sailed from Boston without off-loading the "house-to-house" containers destined for Boston, and without on-loading the containerized cargo which it was scheduled to pick up in Boston.

On the basis of all the evidence I find that this conduct on the part of respondents is a non-compliance with the preliminary injunction entered by this Court on December 9, 1971, particular that part which enjoins respondents "from taking part in a strike . . . in the maritime industry of the United States," and also a violation of that part of the injunction which enjoins respondents "from in any manner interfering with or affecting the orderly continuance of work in said industry."

I further find that the opening of the Moran container facilities in September 1971 amounts to a change in the technology of handling ocean shipments, which change has accentuated the need for orderly continuance of work in the Port of Boston. I find that the conduct in question is likely to produce permanent and irreparable harm to the welfare of the Port of Boston and those industries dependent upon a healthy Port, which harm has serious implications to the entire economy of the State of Massachusetts and, indeed, to the New England area generally. I further find as a fact that this interference with orderly operations in the Port will continue unless it is enjoined by order of this Court and I further find and rule that plaintiffs have a probability of success on the merits of this case. Automatic Radio Mfg. Co. v. Ford Motor Company, 390 F.2d 113 (1 Cir. (1968)), cert. denied 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968).

Accordingly, it is ordered that the respondents and each of them shall cease and desist forthwith from insisting on a requirement of an additional setup under the circumstances described in the pleadings filed in this case and under the circumstances described in this Memorandum. It is further ordered

(1) that this injunction will continue in effect until the date of the expiration of the preliminary injunction entered herein on December 9, 1971, at which time it will cease to be operative and will expire; and (2) that the question of what damages may be recovered by plaintiffs is continued for a further hearing.