**SECURITIES AND EXCHANGE COMMISSION, Plaintiff, Appellant,**

v.

**WORLD RADIO MISSION, INC., et al., Defendants, Appellees.**

No. 76–1285.

United States Court of Appeals, First Circuit.

Argued Oct. 7, 1976.

Decided Nov. 4, 1976.

David Ferber, Sol. to the Com'n, Washington, D. C., with whom David J. Romanski, Asst. Gen. Counsel, and Vernon I. Zvoleff, Atty. S.E.C., Washington, D. C., were on brief, for appellant.

Henry Paul Monaghan, Boston, Mass., with whom Stephen J. Spidelman, John S. Holland and Devine, Millimet, Stahl & Branch, Manchester, N. H., were on brief, for appellees.

Before ALDRICH, McENTEE and CAMPBELL, Circuit Judges.

ALDRICH, Senior Circuit Judge.

Plaintiff Securities and Exchange Commission appeals from the denial of preliminary relief in an action seeking to enjoin a religious organization and its leader from violating the anti-fraud provisions of the 1933 and 1934 Securities Acts. 15 U.S.C. §§ 77q(a), 78j(b); 17 CFR § 240.10b–5.[1] Although, following a three day evidentiary hearing, the court found that plaintiff had "made a *prima facie* showing of a violation of the federal security laws and the likelihood that future violations will occur," it declined to issue a preliminary injunction.[2] This decision, it stated, was based upon "balancing the interests on the equitable scale . . . [T]he issuance of an injunction will have a direct and substantial adverse impact on a bona fide religious organization. On the other had, there is no evidence that the denial of an injunction now will cause any harm to the public, irreparable or otherwise." Defendants, naturally, support both of these propositions. Alternatively, they assert as defenses that they are not selling "securities," that they have no intent to deceive, and that their activities are protected by the First Amendment.

The court found that defendant World Radio Mission (WRM) "is a religious organization engaged in worldwide evangelical religious activities. It proselytizes its beliefs through a radio program and by the publication and distribution of numerous pamphlets, magazines and books. At present, it is building and establishing a religious community in Lancaster, New Hampshire. Defendant White is an ordained minister, the titular head of WRM and the driving force behind it." In addition, the court found, "There is no dispute over the religious purpose and nature of WRM nor the validity and sincerity of White's religious beliefs," a circumstance which the court found to afford defendants special consideration on the issue of a preliminary injunction.

In addition to soliciting outright donations, a matter with which plaintiff cannot be concerned,[3] defendants raise funds through at least two types of investment plans. The first is the sale of "Loan Plans," interest-bearing notes, originally issued in amounts not less than $1,000, payable in seven years, with interest at 8%, and with a ninety-day notice acceleration clause. Later, there were variations, with increased minimum amounts, and interest as high as 12%, sometimes with no early withdrawal-of-principal feature. The second, the "Land Bonus Loan Plan," is a modification of the first, a five-year $10,000 note, paying 9% interest, with a bonus of an acre of land at defendants' White Mountains headquarters. Defendants have raised nearly $1,400,000 through these investment plans.

Defendants contend that these activities do not constitute offerings of "securities." Insofar as the contention is that, viewed as economic transactions, they do not fall within the purview of the securities acts, it is meritless. The Loan Plans fall

1. Securities issued by nonprofit religious organizations are exempt from the registration provisions of the 1933 act, 15 U.S.C. § 77c(a)(4), but are subject to the anti-fraud provisions thereof, 15 U.S.C. § 77q(c), and to the 1934 act.

2. It also refused plaintiff's request for the appointment of a receiver. Plaintiff concedes there is no jurisdictional basis for an appeal on this issue, cf. 28 U.S.C. § 1292(a)(2).

3. Non constat that we accept the breadth of defendants' deductions from First Amendment cases, leading to their repeated assertions that their religious freedoms are being interfered with. Their case of *United States v. Ballard*, 1944, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148, merely holds that there can be no claim that a professed religious tenet was not honestly advanced. It does not hold that a religious organization may make such secular statements as it chooses in seeking contributions, so long as they serve a charitable purpose. To the contrary, in *Cantwell v. Connecticut*, 1940, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, cited frequently in some of defendants' cases, but which defendants neglect to mention, the Court said, at 306, 60 S.Ct. at 904,

"Nothing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public."

squarely within both the literal language of the acts,[4] and the interpretive test developed by the Supreme Court. "The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entreprenurial or managerial efforts of others." *United Housing Foundation, Inc. v. Forman*, 1975, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621; *accord, SEC v. W. J. Howey Co.*, 1946, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244. Nor can we accept defendants' special argument as to the "Land Plan," based on *Forman*, ante, where the Court held that shares in a cooperative apartment building were not "securities," in view of the motives of the purchasers. The case is inapposite. The basis of the opinion was that the purchasers were motivated "solely by the prospect of acquiring a place to live, and not by financial returns on their investments." *Id.* at 853, 95 S.Ct. at 2061. However interested some of defendants' investors may have been in acquiring one acre of "prime" land, this was accurately described by defendants themselves as a "bonus." Even if more substantial than a bonus, *Forman's* crucial word was "solely."[5]

Next, defendants assert that even if their loan plans are securities, special circumstances permit them to claim First Amendment protection. They cannot, of course contend that, like the sale of religious pamphlets by Jehovah's Witnesses, *Murdock v. Pennsylvania*, 1943, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292, the sale of their loan plans is part of their religious creed. However, they seek the same result by their brief's claiming First Amendment application where *"the 'investor' also, in effect, subscribes to religious 'articles of faith.'"* (Emphasis in orig.) There are two fatal flaws.

In the first place, defendants' solicitations are made to the general public. While they particularly address "believers," the appeals contain no restrictions as to the investor's faith or beliefs, nor is there any requirement of an affirmation thereof upon acceptance. That the secular are intended is made clear even with respect to Land Plan participation, which defendants now seek to regard only in terms of a "religious community." The advertisement speaks of,

> "[m]en and women . . . 'fleeing' the frustrating, harried metropolitan life, . . . the mobs and the traffic jams, . . . the crime and the grime, . . running back to more natural, country living,"

and then goes on to add,

> "Of course there are those who want to come for other reasons, . . . to worship in Dayspring Cathedral where [Rev. White] is pastor."

One searches the record in vain for any obligation of conversion on the part of those merely longing for country living. We mention, only to reject as plainly insufficient, Rev. White's oral testimony that on occasion he rejected applications from persons he believed to be speculators. Whatever may have been the religious beliefs of some investors, the only universal "articles of faith" that could be thought common to every subscriber was faith that he was being told the truth.

The inclusion of the general public is a sufficient answer to defendants' attempt to claim the sweep of the First Amendment, but their claim would fail even if defendants, in fact, dealt only with believers. We may accept, for present purposes, their contention, allegedly supported by Scripture, that loans under some circumstances might be considered as essentially contributions.[6]

---

4. "The term 'security' means any note. . . ." 15 U.S.C. § 77b(1); *id.* § 78c(a)(10).

5. To point up the speciousness of this contention, we observe that at the time of the hearing no single investor had requested any land. Even the advertisement's concession, "Not all investors would come . . . ., but some would," was an understatement.

6. We are surprised, though, by defendants' citation of the parable of the servants entrusted with their master's "talents." Matthew 25:14–30. We do not question the parable, but insofar as it indicates a duty to make loans, it is to make profitable ones. A servant contemplating lending to a possibly shaky enterprise would do well to note the final verse.

Parishioners who are deeply motivated may well "lend" to their church with no real expectation of recovery. However, that is not this case. Defendants' appeals uniformly stress the security of the investment, as well as their recognition of the need of their investors for a steady income. This is not even a case where generous believers lend to their church at nominal, or no, interest—a 12% figure suggests defendants' investors are moved by something more than a donative spirit. (Alternatively, if it be said that their need for current income does not permit them to take less, this is an answer to defendants' claim, post, that they are adequately protected, if the venture fails, by their eventual share in liquidation.)

As to the investors' need for regular income, we quote from a Loan Plan advertisement.

> "Many Christians longed to help in God's work, but they . . . *had to have income from their principal to live!* So they left their money in banks or bought stock. . . . [W]e offer . . an alternative which enables concerned men and women to use their substance in the Lord's work and still draw necessary income." (Emphasis in orig.)

As to security, the same advertisement, bearing the headline "While The World's Economy Staggers Weakly *God's Economy Is Stronger Than Ever!*" (Emphasis in orig.) points to "Bank References" and "Solid Backing," and states,

> "You may be a Christian who has committed his life into the hands of God, but left his funds in the hands of a floundering world economy. Financial experts everywhere are predicting a disaster in the economy. They say it is only a matter of time. . . . God's economy does not sink when the world's economy

hits a reef and submerges! Wouldn't it be wise to invest in His economy?"

> .　.　.　.　.

> "Many believers investigated this loan plan opportunity to invest in God's economy. (They *thoroughly investigated*), checking into our assets, our bank and credit references and analyzing our ability to meet our obligation. Having been satisfied regarding these matters, a sizable number of practical, level-headed businessmen and women withdrew funds from banks, or sold stocks and invested them in our Christian loan plan." (Emphasis in orig.)

The fact that the investors may also have had religious motives is irrelevant. As the Court said in *SEC v. C. M. Joiner Leasing Corp.*, 1943, 320 U.S. 344, at 352–53, 64 S.Ct. 120, 124, 88 L.Ed. 88, concerning the reach of the term "securities" in the federal acts,

> "The test . . . is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act such as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be."

Manifestly the reader would take "level-headed businessmen and women" to mean persons activated by temporal, not spiritual, considerations. Having solicited funds on economic grounds, defendants must justify on those grounds. The acts contain no exception for "in house" deception.[7]

Unfortunately, it is only too clear that a "thorough investigation" would discover significant economic facts defendants in no way disclosed; most importantly, a substantially increasing operating deficit, even taking into consideration all outright contributions.[8] Far from disclosing the true financial condition, defendants state that they

---

7. And, indeed, defendants' brief volunteers that it is not part of their creed that they should "fleece their flock." Nevertheless, defendants constantly emphasize that they are engaged in "God's work." No court has ever found that conduct, by being so described, is automatical-

ly immunized from all regulation in the public interest. *See* n.3, ante.

8. WRM's accountant testified that the operating deficit was $42,349 in 1973, $185,415 in 1974, and $203,776 in the first seven months of 1975.

have "proven over the years [that] we are well able" to "generate revenue enough to pay interest, repay principal and still provide funds for the ministry," a statement which is true only in the sense that, to date, they are borrowing money fast enough to pay off their matured indebtedness. No "level-headed businessman" would regard loans that must be repaid as revenue.

Again, in their Loan Plan Prospectus, defendants, perhaps mindful that investors who regarded themselves as level-headed would ask it themselves, pose the question, "How can we possibly pay such interest and still have funds to help the ministry?" They answer,

"World Radio Mission owns a modern, well-equipped publishing company . . . . We can produce literature in this plant that generates revenue enough to pay investors and still have enough left over to be able to provide *ton upon ton of free Gospel literature!*

"For example: Suppose we publish a piece of literature that costs us about 15 cents to produce in massive quantities. That same piece of literature sells retail for $1.25. You can readily see how we can generate income for our ministry from our printing plant!" (Emphasis in orig.)

Though it is difficult to see how it can be squared with the "example" given, defendants now assert that the first quoted paragraph is to be read as referring not to the, in fact paltry, direct revenue, but broadly, to the assistance the literature gives to their efforts to generate contributions. But even were we to attribute all contributions to the literature—a palpable exaggeration, since there were many other appeals—such revenue fell short of meeting current charges. In no way did defendants paint a picture of what their counsel described at the hearing, "planned deficit operations." It is not to be disputed that many businesses start with "planned deficit operations."

What defendants lose sight of is that the acts require that those who market securities must disclose that fact, rather than, through silence, or worse, attract investors by indicating the opposite.

■ In this posture defendants make the contention that there was no intent to deceive. It is true that in the court below, perhaps moved by deference towards an admitted religious organization, plaintiff did not press a claim of intent to deceive, taking the position that it was immaterial. Had this been a concession of the factual issue, it might be thought over-generous. Assuming that defendants' religious motives and purposes were of the highest, it is nonetheless difficult to think they believed that everything they said was accurate. Intent to deceive means intent to say something, that is expected to be relied on, that is not believed to be true, or, if strictly true, is hoped will be understood in an untruthful sense.[9] Confidence that they would be financially successful eventually, or even that no investor would lost money, is in no way equivalent to honesty as to particular representations. *See SEC v. Capital Gains Research Bureau, Inc.,* 1963, 375 U.S. 180, 194–95, 84 S.Ct. 275, 11 L.Ed.2d 237.

■ We need not, however, pursue this line of inquiry. From the standpoint of an SEC injunction against violations which the court finds are likely to persist, a defendant's state of mind is irrelevant. If proposed conduct is objectively within the Congressional definition of injurious to the public, good faith, however much it may be a defense to a private suit for past actions, *see Ernst & Ernst v. Hochfelder;* 1976, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668, should make no difference. *Cf. SEC v. Capital Gains Research Bureau, Inc.,* ante. Even those courts that correctly anticipated the *Hochfelder* outcome and required proof of scienter in private damage actions under rule 10b–5, *see, e. g., Lanza v. Drexel & Co.,*

---

**9.** The above-quoted "example" of producing literature for 15 cents that would retail for $1.25, while carefully expressed as a hypothetical, could well be understood to indicate that defendants were, in such a manner, making sub-

stantial profits. In point of fact, in the years this was being sent out, net revenue from the printing operation amounted to $1,808. in 1973, and $3,535. in 1974.

2 Cir., 1973, 479 F.2d 1277, have not considered intent relevant in SEC injunction actions, *see, e. g., SEC v. Shapiro,* 2 Cir., 1974, 494 F.2d 1301, 1308. An injunction is designed to protect the public against conduct, not to punish a state of mind.[10] *Hecht Co. v. Bowles,* 1944, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754; *SEC v. J & B Industries, Inc.,* D.Mass., 1974, 388 F.Supp. 1082, 1084. We may add that since an injunction is entered only after an adjudication that defendants' proposed conduct prima facie violates the statute, their demonstrated intent to continue evidences, at the least, an intent to do what they now know a federal court, as well as the SEC, has found deceptive.[11]

It does not appear in what detail defendants made these contentions in the district court, but to the extent they did, the court's finding that plaintiff had made "a *prima facie* showing of a violation" comprehensively rejected them, and correctly so. No other finding would have been justified. The showing is peculiarly strengthened by the fact that, while defendants stated they were unready for a plenary trial, they did not specify in what respect. The only areas indicated in their brief before us, and orally, in answer to a specific question, relate to the consequences of the grant or denial of an injunction, and their future potential, an offer which would in no way meet the substantive evidence of a violation. Nevertheless, such consequences are important at the present stage of the proceedings, and we turn to that question.

The district court's amply supported finding of the likelihood that future violations would occur would ordinarily, without more, entitle plaintiff to a preliminary injunction. *SEC v. Management Dynamics, Inc.,* 2 Cir., 1975, 515 F.2d 801, 806–07. Realizing, however, that equitable discretion has its place even in enforcement actions by agencies charged with protection of the public, *see Hecht Co. v. Bowles,* ante, the court appropriately considered the balance of the harms which would result from the grant or denial of preliminary relief. Here, as already stated, it found, "There is no evidence that the denial of an injunction now will cause any harm to the public, irreparable or otherwise." Perhaps because of this finding, it failed to pursue the other customary preliminary injunction inquiry, plaintiff's chances of ultimate success. *Automatic Radio Mfg. Co. v. Ford Motor Co.,* 1 Cir., 1968, 390 F.2d 113, 115, *cert. denied,* 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653.

The court was wrong on both scores. To the extent that a defendant can show harm, this must be discounted by the degree that a plaintiff can show likelihood of success. The more foreseeable is the plaintiff's ultimate success, the less weight is to

10. Defendants engage in a technical argument, that since the language of section 17(a) of the 1933 act is virtually identical to that of Rule 10b–5, and since *Hochfelder* read section 10(b) of the 1934 act, under which Rule 10b–5 was promulgated, as requiring scienter, section 17(a) must be similarly interpreted. This is a non sequitur. The *Hochfelder* Court recognized that Rule 10b–5(2), making it unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," is not, by itself, limited to intentional deceit; but the Court held that the rule, if so interpreted, would exceed the authority of section 10(b) of the statute. 425 U.S. at 212–214, 96 S.Ct. at 1390–1391. Section 17(a), however, is a congressional enactment, not an SEC rule, and it contains the same language which the *Hochfelder* Court recognized did not require scienter. Thus, strictly speaking, since this action is founded on both section 17(a) and Rule 10b–5, we need not decide what result would obtain in an SEC injunction action based solely on section 10(b) and Rule 10b–5—though we do think it implausible to suppose that Congress intended to provide a mechanism for the SEC to protect the public from the injurious schemes of those of evil intent and yet leave the public prey to the same conduct perpetrated by the careless or reckless.

11. We find singularly inappropriate the argument defendants make before us that they should never be enjoined, as an ultimate declaratory judgment would be enough, while at the same time they not only resisted a preliminary injunction, but, while indicating that they would suspend offering their notes, have since apparently engaged in activities that would be hard to distinguish.

be given to the defendant's prospective loss. Here, as we have pointed out, plaintiff's chances are exceptionally high. We must, accordingly, scrutinize the court's finding that plaintiff had shown no prospective interim injury with particular care.

■ As to defendants' harm, obviously an injunction would interfere with defendants' loan program. We may also agree with the finding that it might interfere with their general activities directed towards outright contributions. But we cannot agree that this warranted defendants' invocation of the First Amendment. Congressional failure to exempt religious organizations' securities from the fraud provisions of the acts is an answer to that. If a church benefit lottery were fixed, the church could not ask that it be overlooked because of the possible effect on the offertory. In both areas defendants' possibilities of harm must be discounted.

In finding that no harm to investors would result from denial of a preliminary injunction, the court conceded that defendants "have been operating on a deficit basis for the last three years," but charged plaintiff with "disregard[ing] entirely the future plans of the defendants. . . . The defendants assert that their past deficit operations were only a necessary prelude to what will, in a short time, be a sound revenue raising program and that, at the present time, the market value of the assets of WRM are more than sufficient to meet the demands of its investors. This position cannot be lightly brushed aside." The court then referred to three matters: (1) the "credible evidence showing the potential for substantial revenue raising of the radio program, the print shop and the use of the cathedral as a religious convention center as well as a place to worship"; (2) the testimony that "there was sufficient equity in the real estate of WRM to meet the demands of all investors" and (3) the fact that all investment obligations to date had been fully met.

These considerations do not withstand analysis. Taking them in reverse order, the fact that all investors have been paid to date must be read in the light of the fact that these are long term loans, whose principal has, as yet, been seldom called for. Furthermore, the court overlooked the circumstance that satisfaction of the old investors has been achieved only by using funds received from new ones. It is hardly to be argued that no one is hurt by an improper scheme until it collapses. To put it bluntly, the danger is that Peter is being robbed to pay Paul.

Nor is it an answer that there may be sufficient equity in defendants' land and buildings to satisfy "all investors." The court did not state what it meant by "all." With relation to refusing an injunction, it would have to mean all new, as well as all present, investors. This is a tall order, particularly with respect to an organization vigorously seeking additional investors and yet operating at a substantially increasing deficit. But the important fact is that what might be obtained by eventual liquidation and sale of the assets is far from a substitute for the indicated solidarity of a successful enterprise. This is especially so when viewed from the standpoint of the individual investor. It must be remembered, see ante, that defendants solicited funds from those who needed a current income to live on.[12] The manifest delay, not to mention the inconveniences and uncertainties, makes ultimate recovery by winding up the business highly inadequate protection for such investors.[13]

12. Cf. the advertisement, "[I]nterest payments like clockwork."

13. While not part of the record on this appeal, and hence not entering into our decision, we nevertheless note in the file evidence that defendants are now offering investors First Mortgage interests in their cathedral property. In their Prospectus, ante, appears the statement, "It is equity in real estate that backs your Loan Plan dollars." This was, even then, an amorphous "equity," since no lien documents were ever issued. If a first mortgage lien is, in fact, being given to new investors, it must be obvious that whatever interests defendants' previous investors may have had in defendants' real

In this circumstance defendants' position is not aided by the court's finding of "credible evidence" of future "potential." Potential means possible, not assured. Consistently with this, the court said, "It is entirely possible that the dreams of Reverend White may be shattered by the reality of practical financial operations." To the extent that this was possible, there was harm.

It would seem almost superfluous to suggest that the purpose of the securities acts is to provide investors with current facts concerning practical realities as distinguished from dreams. But this is not all. The potential, which defendants say will be increased markedly when their cathedral is completed, assumes continuation of defendants' borrowing. Thus, we have the ultimate bootstrap—defendants should not be enjoined from proceeding with their tainted conduct, because if they continue long enough, there will be no loss. So, if a company's stock prospectus recited it had $2 million paid-in capital, when it had only $1 million, defendants' principle would permit it to claim (and require the SEC to go to court and litigate it) that there was no harm because, if left alone, its representations would become true.

Although we recognize the district court's broad discretion in matters of preliminary relief, in this case its equitable balance was weighted by serious misconception. The preliminary injunction must issue.

estate are not merely being diluted by being shared in by newcomers—which they could well expect—but may be being altogether supplanted.